(42 App. Div. 218.)

DOHENY et al. v. LACY.

(Supreme Court, Appellate Division, Fourth Department. June 13, 1899.)

1. APPEAL—REVIEW—WEIGHT OF EVIDENCE.

Where, in an action to determine the mental competency of a decedent at the time he executed the agreement in controversy, there was no overwhelming preponderance of evidence that would warrant the court in directing a verdict for plaintiff, who sued to set aside the agreement, and there was no injustice in the agreement, and the conclusion of the jury that he was competent was justified by the evidence, the verdict will not be set aside.

2. CONTRACTS—UNDUE INFLUENCE—EVIDENCE.

Where an agreement was sought to be set aside because obtained by undue influence from one since deceased, and the evidence showed that it was drawn by the decedent and his attorney in the absence of the other party, and without a suggestion from him, and he was not present at its execution, and there was no evidence that the subject of the agreement had ever been alluded to prior to its execution by the parties thereto, and defendant was the close friend of the decedent, and the cashier of his bank, the evidence was insufficient to show undue influence, though the agreement was favorable to the defendant.

3. SAME—BURDEN OF PROOF.

In an action to set aside an agreement as executed by a decedent under the undue influence of defendant, it is error to charge that, if there were

confidential business relations existing between the parties, then the affirmative is on defendant to prove by preponderance of evidence that the contract was not procured by undue influence.

4. SAME.

Before the burden of proof is cast upon defendant in an action to set aside a contract as procured by undue influence, the evidence must show unmistakably that the person charged bears a close relation to the one he is suspected of defrauding, and that the one influenced is suffering from mental impairment, or is subservient to the overmastering will of the person accused.

5. SAME—DEFENSE—PREPONDERANCE OF EVIDENCE.

Where, in an action to set aside a contract for fraud, facts establishing undue influence had been proven, casting a presumption of guilt on defendant, he was not obliged to establish his defense by a preponderance of evidence, but was only bound to controvert evidence offered by plaintiff.

6. PRIVILEGED COMMUNICATIONS.

Where, at the time an attorney drew up an agreement for his client, people were in and out of the room, and the conversation as to the contract proceeded without interruption, regardless of other persons, and the client directed his attorney to advise with the other party to the contract, who was absent, evidence by the attorney as to such conversation with his client was not a privileged communication.

Appeal from trial term, Onondaga county.

Action by George Doheny and Jacob Amos, administrators of Lucius Gleason, against Henry Lacy. Judgment for defendant, and plaintiffs appeal. Affirmed.

This action was brought to recover large sums of money claimed to be due upon promissory notes, and for the value of many shares or certificates of the capital stock of the Third National Bank of Syracuse, N. Y. The defendant was the cashier of this bank, and the executor named in the last will and testament of Lucius Gleason, who was an uncle of the defendant. After the probate of the will, letters testamentary thereon were issued to defendant as sole executor thereof. The defendant was subsequently removed from the executorship, not because of any dereliction of duty, but because his position as resisting debtor of testator might be antagonistic to his duties as executor. Thereupon the plaintiffs were appointed as administrators with the will annexed, and were in sympathy with the next of kin, claiming a liability in excess of that asserted by the defendant, and commenced this action. The answer of defendant, in addition to various averments of payment, set forth that the rights of Gleason and defendant were fixed by an agreement made between them on the 25th day of December, 1892, and which is as follows, viz.:

"Memorandum of an agreement entered into this 24th day of December, 1892, between Lucius Gleason, of Liverpool, N. Y., party of the first part, and Henry Lacy, of Syracuse, N. Y., party of the second part, witnesseth: Whereas, heretofore, on the first day of December, 1883, the party of the first part sold and delivered to the party of the second part ten shares of the capital stock of the Third National Bank of Syracuse at the price of $133⅓ per share; thereafter, on the 21st day of September, 1889, 748 shares of said stock at the price of $133⅓ per share; thereafter, on the first day of May, 1890, 775 shares of new issue of increased stock of said bank, and certain stock purchased from the estate of Harmon W. Van Buren, at $100 per share, and from time to time 164 shares of said stock in addition, at the price of $100 per share, making in all 1,697 shares of said stock; and whereas, it was expressly agreed between the parties hereto at the time of the sale and delivery of said stock as part of the contract, that the party of the second part shall have ample time to pay for such stock, so that the purchase price thereof should practically be paid out of the dividends that might be declared thereon, the party of the first part appreciating the fact that said party of the second part could not otherwise afford to pay for such stock the price so fixed therefor; and whereas, it has been the

policy of the party of the first part, in the management of the said Third National Bank, to defer the payment of dividends on its stock, and, as a consequence, the party of the second part has been unable to make such payments, and it is deemed desirable by the parties hereto that a specified term for the payment of said stock should be fixed, and that the party of the first part should be secured for the payment thereof; and whereas, the party of the first part, fully appreciating the service of the party of the second part in his behalf, is particularly desirous of making the terms of payment liberal and advantageous to the party of the second part: Now, therefore, in consideration of the premises, and of the payment of the sum of one dollar by each to the other, and of the mutual covenants herein contained, the parties hereto mutually agree as follows: (1) The party of the second part is to execute and deliver forthwith to the party of the first part his promissory note for the sum of $194,966.66, which is to become payable in ten years from the date hereof, without interest. (2) The party of the second part agrees that the party of the first part shall have a lien by way of collateral security upon said 1,697 shares of the capital stock of the Third National Bank, and that he will hold said stock as the agent of the party of the first part to the extent of the lien of the latter upon said stock; provided, however, that in case he shall, at the request of the party of the first part, pledge said stock for the benefit of the latter, the possession of such pledge shall be deemed the possession of the party of the second part under the terms of this agreement, it being understood that, in case any stock so pledged for the benefit of the party of the first part shall not be returned to the party of the second part, without expense to him, for the redemption thereof, the amount paid to redeem such stock, or, in case of the failure or inability of the party of the second part to redeem the same, the sum of $133⅓ for every share not returned shall be credited upon said note. (3) The party of the second part shall have the right at any time before the maturity of said note to anticipate the payment of the whole or any part of the principal thereof, and shall, upon such payment, be entitled to a discount from such principal at the rate of six per cent. per annum for the unexpired term of said note. In case a part only of said principal is paid, the party of the second part shall be entitled to the possession of such proportion of said stock, free from all claims thereon as collateral security, as the anticipated payment plus the discount deducted from the principal of said note by reason of such payment bears to the face of said note. (4) This agreement shall inure to the benefit of and shall be bounden upon the personal representatives and assigns of the parties hereto.

"In witness whereof the parties hereto have hereunto affixed their hands the day above written.                                    L. Gleason.
    "Witness:              .                        Henry Lacy. ·
        "H. L. Elsner.
        "Louis Marshall."

There was nothing in the pleadings assailing this agreement, nor was it in any way charged that the same was fraudulently procured, or that Gleason lacked the mental capacity to execute the same, and to comprehend its scope. At the trial, however, for the purpose of simplifying the issues, the following stipulation was entered into, viz.: "It is agreed: That Mr. Lucius Gleason, deceased, advance for the benefit of Mr. Lacy, September 21, 1889, for the purchase of bank stock transferred to Mr. Lacy, $101,166.66, which was used for the purchase of 758 shares of stock in the Third National Bank, which was to draw interest at six per cent. from January 27, 1893. That Mr. Lucius Gleason advanced to Mr. Henry Lacy, the defendant, to purchase five shares of stock, December 2, 1889, $500, which is to draw interest at six per cent. from December 2, 1889; the same being the C. G. Alvord stock. That May 1, 1890, Lucius Gleason advanced to Henry Lacy, to purchase what was known as the 'Van Buren stock,' and to pay for stock issued on an increase of the capital stock of the Third National Bank, which was transferred to Mr. Lacy on that day, in the aggregate 775 shares, $77,500; which is to bear interest at six per cent. from May 1, 1890. That May 26, 1890, Mr. Lucius Gleason, deceased, advanced to Mr. Lacy, the defendant, $5,000, to pay for 50 shares of stock purchased of Nellie H. Frazier, which is to bear interest at six per cent. from May 26, 1890. That May 26, 1890, Mr. Lucius Gleason transferred to

Mr. Lacy, the defendant, 89 shares of stock, for which he is to be charged with $8,900, with interest, from May 26, 1890, at six per cent. That interest as aforesaid is to be computed on said sums, respectively, at the rate aforesaid, to November 5, 1894, when Mr. Lacy is to be credited with $99,692.95, to be taken from the aggregate of principal and interest as above, and interest at six per cent. to be computed on the balance to date." According to the computation made in pursuance of this stipulation the plaintiffs were entitled to recover, if at all, the sum of $157,857.12.

After the production of this stipulation the court made the following statement, viz.: "Let me see if I understand it. I understand that the only issue now to be tried is whether or not a certain contract which has been spoken of here was a valid and binding agreement, and that that depends entirely upon whether or not at the time it was executed Mr. Gleason was of sufficient mental capacity to make the agreement; in other words, that the only issue here is as to Mr. Gleason's mental capacity." Regardless of the pleadings in the action, the parties assented to this, and the large volume of testimony is chiefly directed to the question of the mental capacity of Gleason on the 25th day of December, 1892, at the time of the execution of this agreement.

Argued before HARDIN, P. J., and ADAMS, SPRING, and NASH, JJ.

Frank Hiscock, for appellants.
Edgar N. Wilson, for respondent.

SPRING, J. Lucius Gleason, at the time of his death, was 73 years of age. He had been a man of extraordinary energy during his whole life. Of limited book knowledge, he had accumulated a fortune; was actively engaged in many undertakings of importance and magnitude, and in each was the master spirit. He was instrumental in organizing the Third National Bank of Syracuse, was a large owner of its capital stock, and from early in its organization was its president. He was a bachelor, and apparently was wedded to this bank. He gave much personal attention to its affairs, and the institution was generally well managed, and its stock became valuable. In 1888 he was deposed from the office of president. He was embittered and humiliated by his removal, and, with the resolute and relentless spirit characteristic of him, he set his plans to reinstate himself in the presidency, and quietly purchased, from time to time, large quantities of the capital stock, and turned the same over to the defendant, in whom he had implicit confidence. This stock was, in the main, purchased above its then market value, and was so received by defendant, and the notes which are described in the complaint were given by defendant to Gleason as evidence of the indebtedness existing for this stock. In 1889 Gleason was in command, and caused himself to be re-elected, and announced, in rejoicing over his victory, that those who had accomplished his humiliation would receive few dividends on their certificates of stock, and asserted with acerbity that the policy of the bank would be to retain whatever profit accrued from its business. He increased the salary of defendant as cashier from $2,500 to $12,000 per year, and also gave desirable positions in the bank to the two children of defendant. The object of this large increase in the salary of Lacy was to enable him to take care of the notes which represented the stock which he had acquired from Gleason. A suit brought by some of the stockholders of the bank to require the di-

rectors to declare dividends was decided adversely to the Gleason interests. On the 20th day of December, 1892, he executed his last will and testament. No property was disposed of by this instrument, and its purpose was to appoint the defendant his executor, and also to give significant recital and testimonial to his confidence in the judgment and integrity of Lacy. The will was admitted to probate. On the 25th day of December—five days after the execution of his will—the agreement in controversy was executed. Two days thereafter he executed a deed of his house and lot to his brother, and died January 3d following.

During the fall of 1892, Mr. Gleason was manifestly failing, and was afflicted with diabetic gangrene. On the 2d day of December this malady was so aggravated and painful that he was confined to his bed. The disease progressed rapidly, and he suffered intense pain for the residue of his life. There is a large mass of testimony directed to Mr. Gleason's mental condition during the year 1892, extending down to the time of his death. Mr. Baxter testified that he met him in New York in September, 1892, and that he was then feeble physically; that he was at his house December 28th or 29th, and described his condition at that time, from which it is claimed by plaintiffs that he was incapable of comprehending any business transaction. Mr. Miller assisted in caring for Mr. Gleason from about December 19th until his death. He described the intense pain with which he was afflicted, and said that whisky and morphine were given him to alleviate his sufferings; that he did not talk at all of business matters, although, when aroused up, he seemed to comprehend what was going on about him, and to recognize people in his room; that on one night his bowels moved three times in bed, soiling the clothes and person of Mr. Gleason, but apparently did not attract his attention. Mr. Molloy and Mr. Hawley testified they were in the room of decedent about 2 o'clock in the afternoon of December 25th; that he evidently was in great pain; that the muscles of his face were twitching. Mr. Molloy took hold of his hand, and it was limp and lifeless. And these witnesses were uncertain whether Mr. Gleason recognized them. Mr. Hawley testified that Mr. Molloy made some exclamation while at the bedside of the decedent in regard to his Christmas stocking, and the latter opened his eyes and smiled, but said nothing while they were in the room. There is other testimony which was given upon the part of the plaintiffs tending somewhat to show that Mr. Gleason decreased very perceptibly in flesh during the year 1892; that he was not as regular at his bank as formerly; that he was very nervous, complained of inability to concentrate his faculties, and was a constant sufferer from physical pain. The contention of the plaintiffs is that Mr. Gleason's bank suffered severely in the panic of 1884, and this loss was felt keenly by the president, and unnerved him; that from this period until his death there was a constant decrease in his mental power, and a constant diminution of his bodily strength; and the date of his decline is fixed by the plaintiffs at that period. The proofs show that, whatever may have been the depletion of his mental faculties after 1884, up to within a short time previous to his last

illness confining him to the house, he was engaged in large business
undertakings; that he managed them with rare business ability;
that he was aggressive and unwavering in his attention to his vari-
ous interests; that he was the dominating power in shaping the
policy of the bank, except during the year of his displacement; that
when he organized to counteract the opposition which had dethroned
him he manifested the systematic thoroughness and keenness in
manipulation and unrelenting hatred which were always character-
istic of him. As I understand it, the claim of the plaintiffs is not
that he lacked the capacity during this long period to make the
agreement in controversy, but that the inception of the disease was
during this panic of 1884, and its progress was thenceforward con-
tinuous and insidious until his death. The evidence in detail on the
part of the plaintiffs shows the acts upon which this contention
is. founded, while that of the defendant tends to show that there
was no abatement in decedent's nerve power, unbending resolution,
or comprehensive grasp of the varied business interests in each of
which he was a potential factor. The defendant produced a large
number of witnesses who testified as to the mental condition of
Mr. Gleason after he was confined to the bed with the irritating
disease of which he died. It appears that Mrs. Bogue, who Mr. Mil-
ler said was present at the time of the movement of the bowels, did
not go to Mr. Gleason's until the 29th day of December, so that the
soiling of the bedclothes and person of the sick man must have
occurred after this date. The testimony of Molloy and Hawley,
given in the surrogate's court four years earlier, was received, and
tended to mitigate the effect of their testimony upon this trial.
Betsy Davin, the domestic in the household of Mr. Gleason; her
pastor, Mr. James, who visited him several times during the holi-
days down to December 31st, and had protracted conversations with
him; Daniel Matthews, an old acquaintance; Abel G. Cook, his ac-
countant, and friend of many years; with several others,—narrate
instances and events occurring during this period, indicating that,
while the pain was severe and persistent, yet his intellect was un-
dimmed, and he appreciated whatever matter, whether business or
social, to which he addressed his attention; that he not only kept
track of his business matters, but of the current events occurring
in the world. Mr. Marshall, who had been a prominent attorney in
Syracuse, and an acquaintance of Mr. Gleason since 1884, and since
1889 his confidential adviser, and a director of the bank, and in the
contest for the control of the bank had adhered to Mr. Gleason, pre-
pared both the will and agreement in controversy. The will had
been prepared at the request of the testator during the summer
preceding. Mr. Marshall was then practicing his profession in
New York, and in December went to Chicago, and stopped at Syra-
cuse on the evening of the 19th, and, learning that Mr. Gleason de-
sired to see him, drove to his residence in Liverpool on the after-
noon of the 20th. He had an extended conversation with the tes-
tator, covering a variety of matters, and, according to Mr. Marshall,
he then had a keen insight and a clear appreciation of the subjects
which were discussed. Finally, Mr. Marshall read the will to him.

Mr. Gleason was satisfied with it, and it was executed. Mr. Marshall was familiar with the testator's business relations with defendant, and with the giving of the notes for stock purchased and held by Lacy at the instance of Gleason. He explained to Mr. Gleason that, in the event of his death, Mr. Lacy might be compelled to part with his stock, and thus lose the controlling interest in the bank, which he then held. Mr. Gleason then talked over the most effective method of insuring the defendant in the retention of the stock, and finally determined upon the plan which was later incorporated into the agreement in close conformity to his scheme. Mr. Gleason then stated to Mr. Marshall the amount of the defendant's indebtedness to him, the cost of the bank stock to defendant, and where it was obtained, and asked him to present the matter to Mr. Lacy, and, if the plan evolved was satisfactory to defendant, to prepare a contract accordingly. Mr. Marshall complied with this request, and prepared the contract in suit, and submitted it to the defendant. It was satisfactory to him, and he signed it on the 24th of December. On the evening of the following day the attorney went again to the residence of Mr. Gleason with Dr. Elsner, who was the attending physician. The contract was read over to Mr. Gleason. He made intelligent inquiries and suggestions concerning its various provisions, and, after its reading was completed, expressed his satisfaction with it, and signed it; and Mr. Marshall and the physician signed it as subscribing witnesses, at the request of Mr. Gleason. Mr. Marshall had brought with him the note of Mr. Lacy, which was to represent the indebtedness according to the agreement, and the notes held by Gleason against defendant were surrendered. Mr. Marshall is corroborated in a measure by Mr. Cook as to the execution of the will, and by Mr. Elsner as to what occurred at the time of the reading and execution of the agreement, and these witnesses are distinct and definite in testifying to acts showing a perfect understanding by the testator of what he was doing on these several occasions. This testimony of these many witnesses, all directed to the single issue of the mental condition of Mr. Gleason, extends all through the voluminous appeal book, and we have not attempted to make any minute analysis or summary of it. There is one proposition that is self-evident from this testimony, and that is the determination of the mental condition of Mr. Gleason at the time he executed the agreement rested with the jury. Unmistakably, it was a question of fact, and has been solved in favor of the defendant by the verdict. There was no overwhelming preponderance of evidence in favor of plaintiffs that would warrant the trial judge in directing a verdict for them had he been requested so to do, or to set aside the verdict after its rendition. In fact, the conclusion of the jury was amply justified by the evidence. Nor is there any injustice in the agreement itself crying out for its annulment. Mr. Lacy, the defendant, had long been a trusted officer of the bank. He was a nephew of Mr. Gleason, and had retained his confidence through the stormy contest resulting, first, in the removal, and, second, in the reinstatement of Mr. Gleason to the presidency, and in the conflicts which threatened the disruption of the institution so

dear to this old man. In the subsequent litigation Lacy was still zealous in his fidelity. The stock purchased by Lacy under the direction of Gleason was evidenced by notes which, while due on demand, were without interest, showing plainly an intent to recognize the faithfulness of this nephew. Mr. Gleason had no children. He was a steadfast friend, as well as relentless in his resentments. He sought to retain Lacy at the helm in the bank, to reward him, and entered into the agreement for that purpose. The jury has said he was rational, that he comprehended the scope and purport of the agreement, and the court should not thwart his plan.

As I have already said, at the outset of the trial the court stated the only issue to be tried was the mental capacity of Mr. Gleason, and this was acquiesced in by all parties. Later on, the learned trial judge submitted to the jury the correlative question of whether the agreement was the result of influence improperly exercised over Mr. Gleason inducing him to make the agreement. What we have stated as to the effect of the verdict of the jury on the subject of the mental condition of Mr. Gleason applies with equal force to this branch of the case. The counsel for the appellants has made an elaborate argument to show, as matter of law, that Mr. Lacy was chargeable with having exercised undue influence, because of his relation to the decedent, and has analyzed many authorities in attempted support of this position. From the beginning to the end of this mass of testimony there is nothing upon which the imputation of improper influence can rest. Mr. Lacy was not present at the execution of the will. The contract was originated, and the whole scheme developed, in his absence, and without a hint or suggestion from him. The child had been born and attained manhood before he saw him at all. The agreement as concocted by decedent and Mr. Marshall was concurred in by the defendant without any modification, even of a minor sort. The defendant was not present at its execution by Mr. Gleason, and, so far as the evidence shows, the subject had never been alluded to by Gleason or Lacy. Lacy was the close friend of Gleason, and the cashier of his bank, and these are not relations from which the unlawful domination of one mind over another can be inferred. Mere business connection, or mere opportunity, is not sufficient to support this grave charge. Seguine v. Seguine, 4 Abb. Dec. 191; In re Snelling, 136 N. Y. 515, 32 N. E. 1006; In re Rohe, 22 Misc. Rep. 415, 50 N. Y. Supp. 392. As was said in the case first cited, at page 198:

"Undue influence must be an influence exercised by coercion, imposition, or fraud. It must not be such as arises from the influence of gratitude, affection, or esteem, but it must be the ascendency of another will over that of the testator, whose faculties have been so impaired as to subject him to the controlling influence of force, imposition, or fraud. * * * Moreover, the exertion of the influence upon the very act must be proved, and it will not be inferred from opportunity and interest."

The basic principle actuating men to make wills and confer favors is the tie of relationship, the bond of friendship, or the sentiment of love and affection. Benefactions are not made to enemies; and hence a testator, or one bestowing financial assistance upon another, in selecting those to whom he is drawn by a union of this

kind, is demonstrating a feeling akin to all mankind. After the trial judge had delivered a very exhaustive and impartial charge to the jury, the counsel for the appellants requested the court to charge as follows, viz.:

"I will ask your honor to charge in this case as if the jury find that· there were confidential business relations existing between Lucius Gleason and Henry Lacy in respect to the affairs of Mr. Gleason previous to Mr. Gleason's illness in December, 1892, and which were not disturbed or severed during that month, then the affirmative is upon Mr. Lacy to prove, and he must prove, by a preponderance of evidence, that the contract of December 24, 1892, was not procured by the undue influence of Lacy, or those in his interest, over Gleason, and was not procured by fraud, and was executed by Gleason, he understanding and appreciating its various conditions and covenants."

The court refused to charge as requested, and an exception was taken. There are two or three adequate answers ·to the appellants' contention that this refusal ·was error.

First. It will be observed that this request is restricted to business relations of a confidential nature. In this case they were that Lacy was the cashier of Gleason's bank, and also that he was indebted to the latter. I have examined with some diligence the authorities cited by the counsel for the appellants upon the proposition here urged, but am unable to. find any case enunciating the doctrine that the bare existence of a relation in business which is confidential is ground for that grave suspicion altering the burden generally imposed upon the plaintiff in an action. Every relation of business of any closeness, or extending over a period of years, is confidential in its nature. Co-partners, a cashier and his depositor or customer, the lender and the borrower of money, the directors of a bank or stock corporation, are severally allied in a ·relation which is confidential. It does not follow, however, that, if one bearing any of these associations to another, is charged with the exercise of improper influence upon his associates· to his own benefit, proof of the business connection requires the person accused to demonstrate affirmatively he is not a criminal.

Second. The facts in this case did not justify the submission of this question to the jury. Before the ·burden of proof is ever shifted, and the onus cast upon the defendant to clear himself from an imputation resting upon him, the evidence must show unmistakably that the person charged not only bears a close relation to the one he is· suspected of defrauding, but other facts are essential,—that the one influenced is suffering from mental impairment, and that he has been subservient to the overmastering will power of the person accused. These facts have been clear and pertinent in all the cases cited by the counsel. Barnard v. Gantz, 140 N. Y. 249, 35 N. E. 430; In re Smith, 95 N. Y. 522; Marden v. Dorthy, 12 App. Div. 176, 42 N. Y. Supp. 834; Cowee v. Cornell, 75 N. Y. 92.

Third. If this shifting of the burden of proof had any application to this case whatever, it must be because Lacy had exercised undue influence upon Mr. Gleason. The fact the latter did not possess sufficient capacity to appreciate the kind of contract he was making did not justify the request made. While impairment of intellect necessarily exists where one mind has subverted another,

yet the particular charge which gave a warrant for this request was the fraud imputed to Lacy. As we have already said, the record in this case presents no evidence upon which that charge can be hinged. The antecedent facts creating the suspicion are entirely wanting.

Fourth. But, beyond this, it seems to me there is an entire misconception in the appellants' argument as to what is meant by "the shifting of the burden of proof." It often occurs during the progress of a trial that, upon proof of certain facts, a presumption is created against the defendant calling for proof to clear himself. In an action charging the defendant with fraud, if the requisite facts are proved giving rise to a clear suspicion of fraud exercised by the defendant, then the presumption of its exercise exists, and the defendant must remove the cloud overhanging him. That is a matter of evidence, and the burden originally assumed by the plaintiff assailing the transaction as fraudulent still remains intact. The rule is stated by Judge Rumsey in volume 2 (page 268) of his work on Practice, as follows, viz.:

"During the progress of a trial it often happens that the party gives evidence tending to establish his allegation, sufficient, it may be, to establish it prima facie; and then it is sometimes said that the burden of proof is shifted. All that is meant by this is that there is a necessity of evidence to answer the prima facie case, or it will prevail; but the burden of maintaining the affirmative of the issue involved in the action is upon the party alleging the fact which constitutes the issue, and this burden remains during the trial."

To the same effect are Whitlatch v. Casualty Co., 149 N. Y. 45, 43 N. E. 405; Trust Co. v. Siefke, 144 N. Y. 354, 39 N. E. 358; Heinemann v. Heard, 62 N. Y. 448–455. In the case in 144 N. Y., at page 359, and 39 N. E. 359, the court states the rule as follows, viz.:

"All that this can properly mean is that, when the plaintiff has established a prima facie case, the defendant is bound to controvert it by evidence, otherwise he will be cast in judgment. When such evidence is given, and the case upon the whole evidence—that for and that against the fact asserted by the plaintiff—is submitted to the court or jury, then the question of the burden of proof as to any fact, in its proper sense, arises, and rests upon the party upon whom it was at the outset, and is not shifted by the course of the trial, and the jury may be properly instructed that all material issues tendered by the plaintiff must be established by him by a preponderance of evidence."

The counsel for the appellants asked the court to charge that "the affirmative is upon Lacy to prove, and he must prove, by a preponderance of evidence," that undue influence had not been exerted. Assuming the essential facts had been proved casting the presumption of guilt upon Lacy, this request was far too broad. He was not obliged to establish his defense by a preponderance of evidence. That duty was imposed upon plaintiffs primarily, and so remained throughout the trial. Nor was the affirmative upon the defendant. There is a vast difference between requiring the defendant to remove the imputation resulting from a presumption and assuming the affirmative of an issue. One results from evidence on the trial; the other is a burden derived from the common law, and also imposed by statute. If the facts justified the charge of fraud against the defendant, and he failed to explain away the presump-

tion thus created, the plaintiffs might have been entitled to an instruction that the duty was upon the defendant to relieve himself from the suspicion thus caused; but this request far exceeded what any facts would uphold.

Again, it is contended that the court erred in permitting Mr. Marshall to testify to what occurred at the time the terms of the contract were fixed by Mr. Gleason, and also at the time of its execution, as they were communications between attorney and client, and hence within the prohibition of section 835 of the Code of Civil Procedure. This prohibition is for the protection of the client, and, if the communication is by him announced to the public, or if it occurred in the presence of others, it ceases to be confidential. People v. Buchanan, 145 N. Y. 1–26, 39 N. E. 846. There was no attempt by Mr. Gleason to make this a confidential communication. People were in and out of the room, evidently within the hearing of the decedent, during the talks, and the conversation proceeded without interruption, regardless of the presence or absence of others. Mr. Gleason directed the attorney to advise with Mr. Lacy in regard to the provisions of this agreement, and impart them to him, and, if satisfactory, to have them embodied into a contract, and Gleason made Mr. Marshall his agent for that purpose, and expected, of course, a disclosure of what had occurred; and the prohibition would not therefore be effective. In re Coleman, 111 N. Y. 220, 19 N. E. 71; Rosseau v. Bleau, 131 N. Y. 177, 30 N. E. 52. As was said in the case last cited, at page 184, 131 N. Y., and page 53, 30 N. E.:

"When the deceased commanded the witness to deliver the deed to the grantee named therein, she necessarily waived all objections that she might otherwise make to proof of that fact by the attorney."

This waiver or assent to the removal of the inhibition extends to this action by the personal representatives of the testator. Hurlburt v. Hurlburt, 128 N. Y. 420, 28 N. E. 651. Again, Marshall was a subscribing witness to the agreement by the explicit request of Gleason. This was a positive declaration that he expected his attorney to testify to this agreement, and to speak in its support and vindication. It had the same force as where a testator invites his lawyer to become a subscribing witness to his will. The act is inconsistent with the assumption that he intended his attorney to regard the communication as privileged.

The other objections urged by the appellants' counsel we have examined, but they do not require any independent discussion.

The judgment and order are affirmed, with costs. All concur.