(80 Misc. Rep. 48.)

WATSON v. HOLMES.

(Supreme Court, Equity Term, Monroe County. March 22, 1913.)

1. GIFTS (§ 38*)—UNDUE INFLUENCE—"SPIRITUALISM."

"Spiritualism" is a form of religious belief which should not be inquired into in a judicial proceeding, and undue influence of a donor is not to be inferred merely from the fact that he and the donee were Spiritualists.

[Ed. Note.—For other cases, see Gifts, Cent. Dig. § 74; Dec. Dig. § 38.* For other definitions, see Words and Phrases, vol. 7, p. 6610.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. GIFTS (§ 38*)—"UNDUE INFLUENCE."

"Undue influence" means any improper or wrongful constraint, urging, or persuasion, whereby a party's will is overpowered, and he is induced to dispose of his property otherwise than he would if left to act freely and of his own volition, and whatever disturbs his free act and constrains a person to do with his property what is really against his will and purpose, and which he would not have done if left to himself, is undue influence, whether exercised by physical force, threats, or coaxing.

[Ed. Note.—For other cases, see Gifts, Cent. Dig. § 74; Dec. Dig. § 38.*
For other definitions, see Words and Phrases, vol. 8, pp. 7166–7172.]

3. GIFTS (§ 38*)—"UNDUE INFLUENCE."

The influence which the law regards as undue and illegal must destroy the free agency of the disposing party; but, no matter how slight it may be, if his free agency is destroyed, it destroys also the act resulting therefrom.

[Ed. Note.—For other cases, see Gifts, Cent. Dig. § 74; Dec. Dig. § 38.*]

4. GIFTS (§ 38*)—UNDUE INFLUENCE.

It would not be sufficient to avoid gifts that they were obtained by legitimate influence resulting from honest and disinterested advice.

[Ed. Note.—For other cases, see Gifts, Cent. Dig. § 74; Dec. Dig. § 38.*]

5. GIFTS (§ 36*)—RIGHT TO MAKE.

A man may dispose of his property as he chooses if he is of sound mind, and his disposition thereof is his free and voluntary act, understood by him.

[Ed. Note.—For other cases, see Gifts, Cent. Dig. § 72; Dec. Dig. § 36.*]

6. GIFTS (§ 38*)—UNDUE INFLUENCE.

If the donee takes advantage of an intimate association to subdue and control the mind of the donor and deprive him of his free agency, that the parties are old friends, and that the donee has been kind to the donor, will not make it any the less undue influence.

[Ed. Note.—For other cases, see Gifts, Cent. Dig. § 74; Dec. Dig. § 38.*]

7. GIFTS (§ 49*)—UNDUE INFLUENCE—EVIDENCE.

Evidence of undue influence must be of the clearest and most convincing character, and that which raises a mere suspicion is insufficient.

[Ed. Note.—For other cases, see Gifts, Cent. Dig. §§ 95–100; Dec. Dig. § 49.*]

8. GIFTS (§ 47*)—UNDUE INFLUENCE.

When the parties do not deal in terms of equality and the stronger has seemingly obtained an unfair advantage over the weaker, acquiring a large amount of property from the sick person in her charge, transactions effected under such circumstances must be presumed void.

[Ed. Note.—For other cases, see Gifts, Cent. Dig. §§ 81–86; Dec. Dig. § 47.*]

9. GIFTS (§ 47*)—FRAUD AND UNDUE INFLUENCE—EVIDENCE.

In a suit to set aside gifts on the ground of fraud and undue influence, facts disclosed by the evidence *held* to make a prima facie case, which shifted to defendant the burden of proving by clear and satisfactory evidence that the transfers in question were free and voluntary.

[Ed. Note.—For other cases, see Gifts, Cent. Dig. §§ 81–86; Dec. Dig. § 47.*]

10. GIFTS (§ 49*)—FRAUD AND UNDUE INFLUENCE—EVIDENCE.

In a suit to set aside various gifts on the ground of fraud and undue influence, evidence *held* insufficient to sustain some of the causes of action, and sufficient to sustain others.

[Ed. Note.—For other cases, see Gifts, Cent. Dig. §§ 95–100; Dec. Dig. § 49.*]

**11. Gifts (§ 38\*)—Fraud and Undue Influence—Evidence.**

The fact that the donee was the nurse of the donor during the latter's last illness when he transferred stock to her is not in and of itself sufficient to sustain an inference of fraud and undue influence.

[Ed. Note.—For other cases, see Gifts, Cent. Dig. § 74; Dec. Dig. § 38.\*]

Action by Robert C. Watson, executor of Morton W. Rundel, against Elizabeth A. Holmes. Judgment for plaintiff as to a part of the causes of action.

Asher P. Whipple, of Rochester (John Desmond and John M. Stull, both of Rochester, of counsel), for plaintiff.

Smith, De Graff, Castleman & Mosher, of Rochester (John A. Barhite, of Rochester, of counsel), for defendant.

CLARK, J. This action is brought by the plaintiff, as executor of the will of Morton W. Rundel, deceased, to set aside certain transfers of personal property made by said Rundel in his lifetime to defendant, Elizabeth A. Holmes, on the ground that such transfers, which defendants alleges were gifts, were procured by fraud and undue influence.

Morton W. Rundel was a bachelor and had for many years conducted an art store in the city of Rochester, where he died on the 5th day of November, 1911, aged 73 years. He was not in active business at the time of his death, having retired in 1904. Mr. Rundel left a will dated August 11, 1910, in which this plaintiff was named as executor, and there was a codicil to that will dated April 17, 1911, and after Rundel's death the will and codicil were admitted to probate in the Surrogate's Court of Monroe County. By the terms of the will, after making liberal provision for his sister, who was his nearest relative, and also remembering certain collateral relatives, he devised the residuum of his estate to the city of Rochester for the purpose of establishing a memorial art gallery, but no particular amount was named for that purpose. By the codicil to his will he increased to a certain extent his gifts to collateral relatives and changed the legacy to his sister from the income on $100,000, which was provided for in the will, to a legacy providing that she be paid $3,600 a year, in equal monthly payments of $300 each, secured by 150 shares of Eastman Kodak Company stock, left in trust during the life of his sister.

The defendant and Mr. Rundel had been acquaintances for many years, and they were both Spiritualists, and it is claimed he believed that acting through defendant as a medium he could get reliable information from spirits, both in reference to his health, medical treatment, and business affairs.

In the latter part of July, 1910, Mr. Rundel went to Atlantic City, N. J., intending to spend some little time at that resort. It had been his custom to go to Atlantic City occasionally for rest and recreation. At the time he went in July, 1910, his health was not robust, but he was not by any means in a serious condition, he being up and around and able to attend to his ordinary affairs. Before he went to Atlantic City he had invited defendant and her widowed daughter to go there

as his guests, but they did not accompany him. A few days after Mr. Rundel arrived at Atlantic City defendant and her daughter, Mrs. Sawyer, went there in pursuance of his invitation to visit him, and when they arrived, although he met them at the station in a carriage, they found that he was seriously ill; he having been stricken with a heart difficulty on his journey from Rochester to Atlantic City a few days previously. Defendant was a practical nurse, a widow over 60 years of age, and had followed the business of nursing to a certain extent at Rochester for many years. On her arrival at Atlantic City and finding Mr. Rundel out of health, at his request she at once undertook to care for him, and continued to do so until about the 7th of August, 1910, when she and her daughter returned with him to Rochester. They traveled in the night, he being critically ill at all times during the journey, and defendant stayed up all night and nursed and cared for him. They arrived in Rochester the next morning and went immediately to Mr. Rundel's boarding place at 57 South Clinton street, where he had lived and had rooms for many years. Before arriving in Rochester from Atlantic City, and when they reached Canandaigua, defendant telegraphed or telephoned ahead for a physician to be present and attend Mr. Rundel on their arrival at his boarding place.

The first night after he arrived there defendant did not stay with Mr. Rundel, but left him in the care of his landlady; defendant going to her own residence in Rochester. The next time she saw him, which was the next day, Mr. Rundel had not improved, and he requested defendant to remain and care for him, which she did, giving him excellent care and attention from that time continuously and without interruption until the time of his death. Her attention and care of Mr. Rundel was constant, she being with him practically all the time night and day, she alone ministering to his every want. Mr. Rundel remained in his rooms on South Clinton street from about August 8, 1910, until early in March, 1911, when he moved to a house at No. 732 East Main street, in the city of Rochester, which property was purchased and the title taken in the name of defendant, although it was largely paid for by moneys originally furnished by Mr. Rundel.

Mr. Rundel and defendant had not only been acquaintances, but had been close personal friends for many years previously to 1910, and he had shown his regard for and interest in her by giving her various articles of personal property, notably 50 shares of the common stock of the Eastman Kodak Company May 11, 1908, 30 shares of the common stock of the same company October 7, 1909, and 95 shares of the common stock of the same company February 3, 1910. These gifts, being 175 shares of the common stock of the Eastman Kodak Company, were all made previous to Mr. Rundel's last illness, which came upon him the last days of July, 1910, and at times when he was in his usual mental and physical vigor and these gifts are in no way questioned or attacked in this litigation.

When Mr. Rundel came back from Atlantic City on or about the 8th of August, 1910, he was still the owner of a very large amount of personal property, aggregating in value about $572,000. He owned 1,415 shares of the common stock of the Eastman Kodak Company,

and stocks of many other corporations, as fully detailed in the complaint. Of the 1,415 shares of the Eastman Kodak Company stock above referred to, the defendant received by way of gifts from Mr. Rundel, as she claims, between the day he returned from Atlantic City and the time of his death, 784 shares, and her daughter, Mrs. Sawyer, received 21 shares, also claimed to be a gift. When Mr. Rundel returned from Atlantic City he had on deposit in various banks in the city of Rochester cash aggregating in amount $6,745.49. After his death it was discovered that between the time of his return from Atlantic City and the time of his death ·he had transferred to defendant a large amount of personal property on the dates as follows:

1910.
Aug. 10.　300 shares Eastman Kodak common stock.
Aug. 27.　100 shares Eastman Kodak common stock.
Aug. 27.　100 shares American Fruit Products Company common stock.
Dec. 25.　Cash, $6,500.00.
1911.
Feb.　　Cash, $3,900.00.
June 13.　84 shares Eastman Kodak common stock.
June 13.　18 shares Hungerford Smith stock.
June 17.　Bill of sale, jewelry, pictures, personal effects.
Aug. 1.　Insurance policy for $3,000.
Sept. 22.　300 shares Eastman Kodak common stock.
　　　　Several coupons Century Telephone Co. bonds.　($125.)
Oct.　　495 Consolidated Telephone Co. stock.
　　　　230 General Railway Signal Co. stock.
　　　　25 New York & Kentucky Co. stock.
　　　　308 American ·Fruit Products Co. stock.
　　　　2 Genesee Valley Trust Co. stock.
1911.
Sept. and
October　Cash, $19,100.00.

The value of such securities and cash exceeded $500,000, and it is to set aside these transfers that plaintiff brings this action, claiming that they were procured by fraud and undue influence exercised over Mr. Rundel.

The contention of plaintiff is that defendant was a Spiritualistic medium, and acting through a spirit called Wau Kee, with whom she had communications, she treated Mr. Rundel, and that he believed she had done him great good in such treatments; that when the treatments were given she would go in a tranced condition and Wau Kee .would assist her; that she was also in communication with another spirit called Pat, who was the financial man in the business; that he gave valuable advice as to stock investments; that she in turn advised Mr. Rundel; that because of these peculiar powers defendant claimed to have to communicate with spirits, all of which Mr. Rundel believed, she had absolute control over him and his business affairs; that, because of the fact that there was really nothing in any of her claims to supernatural powers, Mr. Rundel was defrauded and influenced against his will; and that all of the transfers above referred to were procured because of such fraud and undue· influence.

[1] It seems to me that the fact that Mr. Rundel and Mrs. Holmes were Spiritualists has been unduly magnified in this litigation. "Spir-

itualism" is simply a form of religious belief, and what a person's religious views may be should not be inquired into in a judicial proceeding. 40 Cyc. 1011; Keeler v. Keeler, 3 N. Y. Supp. 629;[1] Matter of Halbert, 15 Misc. Rep. 308, 37 N. Y. Supp. 757; Matter of Vedder, 14 N. Y. St. Rep. 470; Matter of Rohe, 22 Misc. Rep. 415, 50 N. Y. Supp. 392; Matter of Vanderbilt, 3 Redf. Sur. 384.

In this country, where a man has the unquestioned right to worship God according to the dictates of his own conscience, whether he believes in one kind of religious teaching or another, or does not believe in any such teaching at all, is not a matter of so much importance when it comes to consider his rights in a court of justice. In this case it is not established that at any time during Mr. Rundel's last illness there were any communications with spirits through Mrs. Holmes, and even if he and defendant believed there were such spirits, and that through Mrs. Holmes Mr. Rundel had had communications with them, there is no evidence that would justify a finding that any such communications had entered in the slightest degree in the transfers sought to be set aside in this action. So far as this case is concerned, Mr. Rundel's religious views must not be permitted to be controlling. It is no more than just that they lie buried with him, and the mere fact that he and defendant were Spiritualists, and that at some time they had had seances and communications with spirits, as they believed, will not justify the inference that such belief was the inducing cause for the transfers in question.

Defendant denies absolutely any fraud or undue influence of any kind used to induce these transfers, but alleges that they were all voluntary gifts made by Mr. Rundel to her in testimony of his affection for her and as a reward for the unquestioned care and kindness she had shown him up to the time of his death.

Although at the times these transfers of personal property to defendant were made Mr. Rundel was a sick man, his difficulty appears to have been largely physical in its character. He had never had any serious illness up to the time he was taken sick in the summer of 1910, although for some time prior to that summer he had not been as robust as in former years. After returning from Atlantic City he was confined to his bed for a few weeks, but then rallied and was able to be up and around the house most of the time until his death, although he was only out of the house on three occasions. He sat in his rooms, visited with neighbors and friends as they would call on him, attended to his usual business, wrote letters and checks, and, so far as his mental powers were concerned, there is no evidence to justify a finding that they were in any way seriously impaired. On the contrary, the evidence is quite sufficient to justify the conclusion that at all times between the time of his return from Atlantic City in 1910 up to near the date of his death, November 5, 1911, Mr. Rundel was possessed of his usual mental faculties, and, so far as they were concerned, was entirely competent to transact all ordinary business, so the plaintiff's

---

[1] Reported in full in the New York Supplement; reported as a memorandum decision without opinion in 49 Hun, 636.

contention must rest entirely upon the claim that the transfers were procured by fraud and undue influence.

[2, 3] Now "undue influence" means any improper or wrongful constraint, urging, or persuasion whereby the will of a party is overpowered, and he is induced to do acts in relation to the disposition of his property which he would not do if left to act freely and of his own volition, and whatever disturbs the free act and constrains a person to do with his property what is really against his will and purpose, and which he would not have done if left to himself, is "undue influence," whether exercised by physical force or by threats or by coaxing. It is impossible to describe or define with any great precision what undue influence really is, what the quality or extent of one mind over another must be to make it undue influence in the eyes of the law.

But the influence exercised by one person over another which the law would regard as undue and illegal must be of such a character as to destroy the free agency of the party who disposes of his property; but, no matter how slight the influence may be, if the free agency of the party is destroyed, it destroys also the act or acts which come from it—which are the result of it.

[4, 5] Now if Mrs. Holmes by virtue of her associations with and relations to Mr. Rundel had such an influence over him with reference to his property, so that her will was substituted in place of his will, then such an influence might well be deemed undue influence which would destroy the acts resulting from it. But not every influence is undue influence by any means, and it would not be sufficient to avoid these transfers that they were obtained by legitimate influence resulting from honest and disinterested advice. Mr. Rundel, being a man of sound mind and competent, if not unduly influenced or defrauded, had a right to bestow his bounty upon the objects of his affection, and he had a right from gratitude to reward any person who had rendered him services. The idea cannot be too strongly emphasized that it is no part of the province of the court, or anybody else, to step in, and by a judicial inquiry and decision in effect say what Mr. Rundel ought or ought not to have done with his property. In this country a man who has industry, intelligence, and frugality enough to accumulate a fortune has a perfect right to dispose of it as he chooses, provided, of course, he is of sound mind, and that whatever disposition he makes of his property is understood by him and is his free and voluntary act.

[6] If however, Mrs. Holmes by reason of her position took advantage of any affection Mr. Rundel had for her and obtained these transfers unjustly, and if she, because of her intimate association with him, used her position to subdue and control the mind of Mr. Rundel and to deprive him of his free agency, then the fact that they were old friends and that she had been kind to him would make it no less a case of undue influence.

[7] It is almost impossible to establish undue influence by direct proof. If established at all, it must be made up of a variety of circumstances and little incidents, and must be gathered from all the facts surrounding the case; but whatever the character of the proof pre-

sented with an idea of establishing undue influence, whether direct or circumstantial, it must be of the clearest and most convincing character. Evidence which raises a mere suspicion that Mrs. Holmes, because of the fact that she nursed and cared for Mr. Rundel, and had the opportunity, unduly influenced him, is not sufficient.

The case of Tyler v. Gardiner, 35 N. Y. 559, cited by counsel for plaintiff, is not a controlling authority to sustain his contention here, for the reason that the facts in that case are quite dissimilar to the facts in the case at bar. In the Gardiner Case the evidence was clear and convincing, not only that the daughter, who was the principal beneficiary under the will sought to be probated, had the opportunity to influence her aged mother, but that she actually had influenced and controlled her in the matter of making the will. The proof was clear and satisfactory that she was the means of getting her mother in a state of mind whereby she excluded her son, the contestant, from her home and premises. It also appeared that the will in controversy, as finally drawn, followed absolutely a written memorandum which had been prepared by the daughter, and was in her own handwriting; that, although her mother had been critically ill for some time, the son was not apprised of said illness, although he lived within 2½ miles of his mother's residence; and that the entire conduct of the mother toward her son was changed after the daughter became a member of her family the fall before her death, and the disposition by Mrs. Gardiner of her property by her last will, which was made only a few hours before her death, was materially different from the disposition made by a former will and greatly to the advantage of the daughter.

In the case at bar, in giving securities to Mrs. Holmes after she had become his attendant and nurse, Mr. Rundel was pursuing a course similar to his transactions prior to her sustaining that relation to him, for it is established that before he was stricken with his fatal illness in August, 1910, he had made large gifts of securities to Mrs. Holmes. If these gifts had occurred so near the time of Mr. Rundel's death that they might be deemed deathbed transactions—that is, if all the gifts had been made when he was in extremis and just before his death, as in the case of Tyler v. Gardiner, supra—the conclusion would have been irresistible that the transactions were the result of undue influence, but the gifts to defendant covered a period of many months, and with reference to many of them there is no evidence that Mrs. Holmes had anything to do with them until after the transfers had been made.

The case of Huguenin v. Baseley, 14 Ves. 273, a celebrated English authority, holds, in a case somewhat similar to this, that:

"The question is not whether she (the grantor) knew what she was doing, had done, or promised to do, but how the intention was produced; whether all that care and providence was placed around her, as against those who advised her, which from their situation, and relation with respect to her, they were bound to exert in her behalf."

Under the evidence in this case I do not see where defendant had taken advantage of her position with Mr. Rundel prior to the time he transferred to her the life insurance policy, to induce or influence him

to transfer property to her; but, beginning with that transaction, it is quite clear to me that she actively interfered with his business affairs.

[8] Mr. Rundel being ill and under defendant's constant care, it is plain that they did not deal on terms of equality, and, under these circumstances, where the stronger party has seemingly obtained an unfair advantage over the weaker one, and has obtained a very large amount of property from the sick person in her charge, transactions effected under such circumstances may be presumed void, as was held in Green v. Roworth, 113 N. Y. 462, 21 N. E. 165, and I think the relations between Mr. Rundel and the defendant were such as to create the inference that she dominated and controlled him with reference to the transactions in question beginning with the life insurance policy transfer and following on through each subsequent transfer involved in this controversy.

[9] The fact that Mr. Rundel was very ill at all times when the transfers in question were made, and that defendant was his nurse, and that while that relation existed he transferred to her securities exceeding in value half a million dollars, created a situation which naturally gave rise to suspicion as to their regularity and good faith and fully justified plaintiff in instituting this litigation. Indeed, the facts as disclosed here made a prima facie case in favor of the contentions of the plaintiff, which should shift the burden to the defendant of proving that the transfers in question were the free and voluntary acts of Mr. Rundel by evidence that was clear and satisfactory. In re Van Ness' Will, 78 Misc. Rep. 592, 139 N. Y. Supp. 485; Matter of Snelling, 136 N. Y. 515, 32 N. E. 1006; Doheny v. Lacy, 42 App. Div. 218, 59 N. Y. Supp. 724, affirmed 168 N. Y. 213, 61 N. E. 255.

An attempt was made on the trial to show that during the progress of Mr. Rundel's illness defendant prevented his old neighbors and friends from seeing him; but while on some few occasions it appears that when he was asleep, or after consultation with him he did not care to see people, they were refused admittance, the great mass of the testimony shows that at all reasonable times old neighbors and friends of Mr. Rundel were permitted to see and converse with him.

The transfers sought to be set aside were made at various times covering a period of about 15 months, and, if any of them were brought about by an improper and undue influence exercised over Mr. Rundel by defendant, it does not necessarily follow that that influence applied and entered into them all, for the reason that the transfers occurred at widely different times and under varying conditions. The relations existing between Mr. Rundel and defendant as established by the evidence and the fact that she is so largely interested in the result of this litigation required that all the transactions which she claimed were gifts should be looked into with the greatest care, and, because as a witness she was so vitally interested, the weight attached to her testimony has been greatly lessened, although no attempt has been made to discredit her in any way excepting by contradictions of witnesses and discrepancies between her testimony given on the trial and the discovery proceedings in the Surrogate's Court.

Plaintiff has set forth in his complaint 11 different causes of action,

and asks to have the transfers described therein respectively set aside on the ground that they were procured by fraud and undue influence, and for convenience they will be considered separately and in regular order.

### First Cause of Action.

[10] On August 10, 1910, Mr. Rundel transferred to Mrs. Holmes 300 shares of the common stock of the Eastman Kodak Company. Plaintiff alleges that this transfer was procured by fraud and undue influence. Defendant denies that and alleges that it was a gift from Mr. Rundel and was his free and voluntary act.

On the 9th of August, 1910, plaintiff called on Mr. Rundel and found him sick in bed. He told plaintiff about his trip to Atlantic City, his being taken ill there, and about his return home. He stated that he was glad to get back to Rochester, as there were some matters he desired to get in shape, and he asked Mr. Watson (plaintiff) if the Rochester Trust & Safe Deposit Company, of which he is secretary, would release from the collateral it held against him as security for certain loans 300 shares of Kodak stock, and, on receiving an affirmative reply, plaintiff prepared an order addressed to the company for these 300 shares, Mr. Rundel signed it, and he told Mr. Watson to transfer these shares to Mrs. Holmes, saying to him:

"You do not know her, but she is the lady in the other room. She has taken care of me through serious illness prior to this time, and I feel that she has saved my life on account of her care to me, and I desire to have these shares transferred to her, and I wish you would bring about the transfers for me."

In that conversation he told Mr. Watson that he had a memorandum in his safe in the Granite building, stating what he desired to be put in a will which he was about to make. The memorandum was procured, and Mr. Watson brought Mr. Whipple, an attorney (and plaintiff's attorney in this action), to draw the will, which was executed August 11, 1910, and in it he provided, among other things, for a memorial art gallery to be established in Rochester, and which was to bear his name.

These 300 shares of stock were transferred and the certificates brought back to Mr. Rundel August 10, 1910, and Mr. Watson, this plaintiff, transacted the business, and there is not sufficient evidence to justify a finding that Mrs. Holmes was present at any part of these conversations, or that she had any previous knowledge of Mr. Rundel's purpose to give her these 300 shares of Kodak stock. They were delivered to her on that day, and she has had possession of them since. I am satisfied from the evidence that this transfer of 300 shares of stock of the Eastman Kodak Company August 10, 1910, was the deliberate and voluntary act of Mr. Rundel, that he fully understood what he was doing when he made the transfer, that Mrs. Holmes had no previous knowledge of the transaction, that it was not tainted with fraud or undue influence, and that when the said shares were delivered to defendant she obtained a perfectly good title thereto, and from that time was entitled to all the income derived therefrom.

It must therefore be held that as to the first cause of action plaintiff's complaint should be dismissed.

## Second Cause of Action.

On the 26th day of August, 1910, Mr. Rundel asked the plaintiff to transfer an additional 100 shares of Kodak common stock and 100 shares of the common stock of the American Fruit Products Company, belonging to him, to Mrs. Holmes. These stocks were in his safe deposit box which was there in his room at his boarding house; it not having been returned to the trust company after Mr. Watson took it to Mr. Rundel early in the month. Mr. Rundel took these shares of stock, 100 shares of Kodak common and 100 shares of American Fruit common and handed the Kodak shares to Mr. Watson, who inquired his reason for making additional transfers to Mrs. Holmes. It may be observed in passing that this was not an improper inquiry on the part of Mr. Watson, because he had knowledge of the fact that Mr. Rundel had previously made his will naming Mr. Watson executor thereof. In reply to that inquiry, Mr. Rundel stated that he and Mrs. Holmes had an understanding not only as to these shares but as to the other shares previously transferred. But in view of the memorandum in Mr. Rundel's handwriting as shown by Exhibits 60 and 69, wherein Mr. Rundel writes, "Belongs to Mrs. E. A. Holmes," it must be held that he intended these transfers to be absolute, and not that Mrs. Holmes should have the life use merely, and this conclusion is strengthened because of the fact that on the 26th day of November, 1910, in a letter which Mr. Rundel wrote to plaintiff, among other things he refers to 100 shares of stock which he requested Mr. Watson to have transferred to Elizabeth A. Holmes and deliver to her when the transfer was completed.

[11] The 100 shares of Fruit stock, referred to above, the transfer of which is also sought to be set aside in this second cause of action, were brought to Mr. Watson by Mrs. Holmes, August 27, 1910, the next day after Mr. Rundel had taken them out of his safe deposit box, and, on an order signed by Mr. Rundel, Mr. Watson had the 100 shares of Kodak stock and the 100 shares of Fruit stock transferred to Mrs. Holmes, and the certificates were delivered to her by Mr. Rundel himself. I am satisfied that, from the evidence while Mrs. Holmes was in and out of the room when Mr. Watson and Mr. Rundel were talking about the 100 shares of Kodak and the 100 shares of Fruit stock, she took no part in the transaction, and it cannot be found as a fact that she induced these transfers either by fraud or undue influence, unless that could be inferred from the fact that she was the nurse and that Mr. Rundel transferred the stock to her. That in and of itself is not sufficient, and the evidence would not justify a finding that these transfers of stock were the result of undue influence.

It must therefore be held that as to the 100 shares of Kodak common stock and the 100 shares of American Fruit Products common stock, referred to in the plaintiff's second cause of action, they were given and delivered to Mrs. Holmes, that such gifts were his free and voluntary acts, that no fraud or undue influence entered into the transactions or either one of them, and that defendant is the owner of said shares and was entitled to the income derived therefrom after said

transfers were made. The second cause of action set forth in plaintiff's complaint must therefore be dismissed.

### Third Cause of Action.

On the 25th day of December, 1910, Mr. Rundel took dinner with defendant at her house in Rochester, and Mrs. Holmes is corroborated in her statement that, while there at her home and looking at other Christmas presents, Mr. Rundel took from his pocket a package containing $6,500 and gave it to Mrs. Holmes, saying, "This is for you." Mr. Pringle, a witness for defendant, and who corroborated her as to this transaction, has been a roomer in her house for years, and is undoubtedly friendly with her and her family, but his appearance as a witness was favorable, and in view of the fact that Mr. Rundel had often expressed to others his appreciation of what Mrs. Holmes had done for him, and that he had theretofore given her large amounts of stock, there is nothing improbable about the story told by the witnesses as to this Christmas gift, and it must be held that it was Mr. Rundel's free and voluntary act, and that he understood what he was doing when he made this present to Mrs. Holmes, and that when Mr. Rundel delivered to her the package containing this sum of money he intended it as a gift, and it became absolute, she obtaining good title thereto; and the complaint in so far as it relates to the third cause of action must be dismissed.

### Fourth Cause of Action.

For a considerable time prior to the spring of 1911, Mr. Rundel had been dissatisfied with his apartments, and had desired Mrs. Holmes to purchase a residence. He had stated to several people that he wished to change his quarters, and had looked at photographs of the Howard house on East Main street, which, under his advice, Mrs. Holmes purchased. When she came to pay for the property, she lacked $3,900, and the evidence is that Mr. Rundel gave her this amount of money to complete paying for the house. While defendant is not directly corroborated as to this transaction, Mr. Rundel's conversations to other people about his desire to change his location and his frequent conversations with reference to this house that Mrs. Holmes had purchased, all go to show that he understood fully all about the transaction, and I am inclined to think that defendant's explanation as to the $3,900 transaction is sufficient, and that it must be held that his gift of that amount to her was his free and voluntary act, and that on delivery of the same to defendant she obtained good title thereto, and that the complaint, in so far as the fourth cause of action is concerned, must be dismissed.

### Fifth Cause of Action.

On the 13th day of June, 1911, Mr. Rundel transferred to the defendant 84 shares of common stock of the Eastman Kodak Company, and 18 shares of the capital stock of the J. Hungerford Smith Company. Mr. Walmsley, a witness produced for the defense, and who had known Mr. Rundel over 21 years, testified that he often called on Mr. Rundel and visited with him after he came back from Atlantic

City, and that in the course of these conversations he had stated to him that Mrs. Holmes was very kind to him, and that he did not know how he could have gotten along without her, and that he appreciated thoroughly what she had done for him. He also testified that at Mr. Rundel's request he caused to be transferred to Mrs. Holmes 84 shares of Kodak stock and 18 shares of Hungerford Smith stock, above referred to, in June, 1911. He testified that Mr. Rundel showed him the certificates and asked him to go to the bank and have them made out to Mrs. Holmes, referring to the Kodak stock, and he went to the office of the Hungerford Smith Company, and had the 18 shares transferred to Mrs. Holmes, and after it was done he returned the shares to Mr. Rundel, and that Mrs. Holmes was not present at any of these conversations. In the course of the conversations, witness testified that Mr. Rundel stated to him that he purposed to reward Mrs. Holmes for her kindness to him, and to fix her so she would not have to worry again.

Mrs. Holmes testified that she knew nothing about the transaction of transferring the 84 shares of Kodak stock and the 18 shares of Hungerford Smith stock herein referred to. Under these circumstances, it cannot be held that there was any fraud or undue influence, unless the testimony of both Mr. Walmsley and Mrs. Holmes is absolutely disregarded, and as to the witness Walmsley, at least, that would hardly be justifiable.

It must therefore be held that the evidence of the transfers of the 84 shares of Kodak stock and the 18 shares of Hungerford Smith stock, particularly referred to in plaintiff's fifth cause of action, establishes the fact that these stocks were given and delivered to Mrs. Holmes in June, 1911, that Mr. Rundel understood what he was doing, and that he intended to give her title to these securities, and that said gifts were his free and voluntary acts, and on delivering said stocks to defendant she acquired good title thereto, and the complaint so far as the matters referred to in the fifth cause of action must be dismissed.

### Sixth Cause of Action.

On the 17th day of June, 1911, Mr. Rundel executed and delivered to Mrs. Holmes a bill of sale, conveying to her a large quantity of household goods, pictures, jewelry, etc.; the instrument being witnessed by Mr. Walmsley and Mr. Pringle. This bill of sale was in Mr. Rundel's handwriting, every word of it, and is written in a good strong hand, and the impression is that he knew what he was doing when he wrote it. The evidence is that Mr. Walmsley was calling on Mr. Rundel on the day this instrument was executed, and Mr. Rundel handed it to him, and asked him to read it and sign it as a witness, which he did.

Mr. Quinn, another witness produced by defendant, testified that in October, 1911, Mr. Rundel told him that he had made a bill of sale to Mrs. Holmes of a quantity of household goods. Miss Rundel, a witness for plaintiff, and sister of the deceased, said that Mrs. Holmes told her about this bill of sale, and showed it to her in the summer of

1911, and Mr. Rundel himself told his sister, according to her testimony, that he had disposed of the things in the house to Mrs. Holmes. There is much more evidence that might be referred to with reference to this transaction, but there nowhere appears sufficient evidence to justify a finding that the bill of sale was procured by fraud and undue influence. While the instrument is sweeping in its terms, and covers a very large part of the household effects of deceased, all the evidence goes to show that it was his free and voluntary act, and it could not be held that this transfer was procured by undue influence, unless the court should read into the transaction something that is not borne out by the evidence, however unjust that transfer may seem to have been, for it was the free and intelligent act of Mr. Rundel, and it must be held that the making and executing of the bill of sale referred to in this cause of action was the free and voluntary act of Mr. Rundel, and that on its delivery to defendant she obtained good title to all the property therein mentioned, and the complaint as to all matters referred to in the sixth cause of action must be dismissed.

### Seventh Cause of Action.

On the 1st day of August, 1911, Mr. Rundel transferred to the defendant a life insurance policy of $3,000, issued by the Equitable Life Assurance Society in 1897, upon his life. This policy had been carried for the benefit of his surviving sister, Miss Harriet Rundel. It appears from the evidence that shortly before the assignment Mr. Rundel concluded to get rid of this policy. He had some negotiations with the company about it, and was offered $900 in cash, but he transferred it subsequently to Mrs. Holmes for $500. She testified that she paid him that amount for the policy, and that she also gave him $185 or thereabouts, to pay some back premium. After this assignment Mrs. Holmes held the policy, and a little more than three months after that Mr. Rundel died, and she collected about $2,206.56 on it. This transaction looks very peculiar. Concededly Mr. Rundel was a very sick man, although he was able to be up and around the house. At this time he was living at Mrs. Holmes' house, she was preparing his meals, and was his constant attendant. From statements he had often made he appreciated the fact that he did not have long to live. Here was a life insurance policy he had carried for some years. It is singular that under these circumstances he would be anxious to dispose of a policy in a perfectly reliable company for less than $\frac{1}{4}$ of what he knew would be paid on it at his death, and a little more than $\frac{1}{2}$ what the company had actually offered him in cash for it.

Mrs. Holmes' explanation of this transaction is not at all satisfactory. Considering all the surrounding circumstances, and the fact that it is claimed he was anxious to get rid of this policy, which he knew was perfectly good, for a sum very much less than its actual value, and considering the fact that, if Mrs. Holmes' version of the transaction is true, he sold it to her for very much less than the company had actually offered for it in cash, the conclusion is irresistible that there was some undue persuasion or influence brought to bear on Mr. Rundel to induce him to make such a transfer. The whole story is

unreasonable and improbable, and I have no hesitancy in holding that under the evidence the transfer of the insurance policy referred to in the seventh cause of action was induced by undue influence brought to bear on Mr. Rundel by the defendant, and for that reason the transfer should be set aside, and defendant should account to plaintiff for all moneys received thereunder, together with interest thereon from the date the policy was paid.

### Eighth Cause of Action.

The transaction with reference to the insurance policy leaves no doubt in my mind that at that time defendant was actively interfering with Mr. Rundel's business affairs. She had theretofore received large sums of money and valuable stocks from him, and she evidently considered that they came easily, and her getting the transfer of the insurance policy in the way described leaves the impression that her will was then controlling with Mr. Rundel, and his free agency was destroyed, and, he once yielding to her in a transaction of that character, it was easy for the policy of getting still more property to be formed and followed by defendant.

On the 22d day of September, 1911, Mr. Rundel transferred to the defendant 300 additional shares of Eastman Kodak Company stock. At this time Mr. Rundel's health and strength were steadily declining, and he was greatly enfeebled in body. Only a few weeks previously he had made the transfer to her of the life insurance policy, through methods which amounted to undue influence, and that, being followed the very next month by the transfer of the 300 shares of Kodak stock of the value of nearly $150,000, leads to the conclusion that defendant was adopting the same methods with reference to that that had been so successfully followed with reference to the transfer of the life insurance policy, and I think the evidence justifies the conclusion that the transfer in question was not Mr. Rundel's free and voluntary act, but was induced by defendant's overpowering influence over him, and that influence actually entered into the transaction. So it must be held that the transfer of the 300 shares of the Eastman Kodak Company stock, by Mr. Rundel to defendant, on or about September 22, 1911, was induced by undue influence exercised over the donor by defendant, and that said transfer was not Mr. Rundel's free and voluntary act, and should be set aside, and defendant required to account to plaintiff for the same, and transfer said stock certificates to the plaintiff as executor of Mr. Rundel's estate.

### Ninth Cause of Action.

Plaintiff claims in the ninth cause of action that between the 5th day of August, 1910, and the date of Mr. Rundel's death, at various times defendant procured from him $30,000 in cash, and that her obtaining such moneys was by means of undue influence exercised upon Mr. Rundel. Defendant in her answer denies that allegation, but admits that in the months of September and October, 1911, Mr. Rundel gave her various sums of money, aggregating $19,100 in amount, and alleges that these transfers were his free and voluntary gifts.

It is quite true that between August 5, 1910, and the time of his death Mr. Rundel had received in dividends on stocks large sums of money, but it does not necessarily follow that this defendant got all of it, or any excepting what she admits she received. He had expenses to pay, was sending money to his sister regularly, and it cannot be said, without evidence to support such a finding, that Mrs. Holmes got hold of this money. She admits, however, that she received $19,100 of it in September and October, 1911, and her explanation is not sufficient to overcome the inference that it was improperly obtained. At that time the condition of Mr. Rundel's health was such that in view of the fact that defendant was his constant attendant and nurse, and was with him practically all the time, night and day, the inference is permissible that she overpersuaded and improperly influenced Mr. Rundel to give her these sums of money, and her explanation is hardly sufficient to overcome that inference, and she should therefore account for and pay over to the executor said sum of $19,100, with interest thereon from the 5th day of November, 1911.

### Tenth Cause of Action.

The plaintiff charges that between the 5th of August, 1910, and the 5th of November, 1911, defendant cut from certain bonds of the Century Telephone Construction Company several coupons, aggregating in amount $125, which were payable January 1, 1912, and got them cashed after that date. This is a peculiar transaction, and there is very little evidence about it; but the fact that Mrs. Holmes during the last weeks of Mr. Rundel's life had access to his safe and knew its combination, and that after his death, November 5, 1911, it was found that coupons not yet due had been cut from those bonds, it raises the inference that defendant had taken advantage of her position and had gotten the coupons improperly, and inasmuch as no satisfactory explanation is made on that subject, as to how, or when, or why, she got possession of these coupons, it must be held that they were never voluntarily transferred by Mr. Rundel to Mrs. Holmes, and that she should account therefor to the plaintiff herein, and pay to him the sum of $125, with interest thereon from the 1st day of January, 1912.

### Eleventh Cause of Action.

In the eleventh cause of action it is charged that in October, 1911, dates not given, Mr. Rundel transferred to defendant the following:

495 shares Consolidated Telephone Co. stock of the value of........$4,950 00
230 shares General Railway Signal Co. stock of the value of........ 6,440 00
25 shares New York & Kentucky common stock of the value of...... 2,875 00
308 shares American Fruit Products Co. stock of the value of....... 3,744 00
2 shares Genesee Valley Trust Co. stock of the value of........... 380 00

That such transfers were made without consideration and were the result of undue influence exercised by defendant upon Mr. Rundel. These transfers were made only a short time before Mr. Rundel's death; it being conceded that he died November 5, 1911, and there being no claim but that the transfers referred to were made in October, 1911. At this time Mr. Rundel was a very sick man, and defendant

was his nurse and attendant. Under these circumstances, it was incumbent upon her to explain by clear and satisfactory evidence that these transfers were Mr. Rundel's free and voluntary acts, and such evidence seems to be lacking with reference to all of them.

The same overpowering influence of defendant over Mr. Rundel, which first manifested itself in the unnatural disposition of the life insurance policy, continued to the end of Mr. Rundel's life and affected each of the subsequent transfers referred to in the complaint, and I think those mentioned in the eleventh cause of action were all induced by an undue influence exercised over Mr. Rundel by defendant, and they were not his free and voluntary acts. For that reason the transfers should be set aside, the stocks returned to his estate, and she should be required to account to plaintiff for any moneys she has received therefor.

The fact that Mr. Rundel was an aged and feeble man, and that defendant was his nurse and with him constantly, and the further fact that during his last illness she received from him such a large amount of property, naturally gave rise to the suspicion that the transfers were not his free and voluntary acts; but I cannot see where any fraud was exercised over him by defendant through the agency of their peculiar religious beliefs, and as to all the transactions prior to the assignment of the life insurance policy on or about the 1st day of August, 1911, the evidence would not justify a finding that any of them were obtained by undue influence, but that transaction, and each one that followed, as referred to in the complaint, was obtained under circumstances that fully justify the belief that defendant exercised an undue and improper influence over Mr. Rundel in obtaining them, and in each instance they should be set aside, as hereinbefore indicated.

Judgment may be entered in accordance with these views, and counsel will be heard further on the question of costs.