}The First National Bank of Coffeyville, as Executor, etc.,
of Perry K. Willett, Deceased, Appellant, *v.* John C. Wright
and Another, Respondents.

Third Department, January 9, 1924.

**Contracts — action to set aside assignment executed by plaintiff's testator
of his interest in his nephew's estate which was made to defendants
in consideration of their caring for plaintiff's testator during his life —
action is based on fraud in execution of assignment — plaintiff's testator
at time of execution of assignment was living with and under control
of defendants — burden is on defendants to show lack of fraud —
assignment is set aside.**

In an action to set aside an assignment which purports to transfer to the defendants
all the interest that the plaintiff's testator had in the estate of his nephew, it
appears that plaintiff's testator, a man past ninety years of age, had lived for
more than forty years in Kansas; that the defendants, who were relatives of
the plaintiff's testator, upon learning that he was one of the heirs of a nephew
who had recently died leaving a large estate, went to Kansas with their attorney
and brought the plaintiff's testator home with them; that a few days after he
arrived in this State the defendants' attorney presented to plaintiff's testator a
completed assignment of his interest in the estate of his nephew to the defendants in
consideration of their caring for him during his life, which assignment he executed
without the advice of counsel; that while plaintiff's testator lived in Kansas he
executed a power of attorney to a bank there for the purpose of managing his
estate; that the defendants misrepresented to the plaintiff's testator the value of
his interest in his nephew's estate; that plaintiff's testator was very feeble and
his memory was not good and he was easily influenced by those with whom he
lived; and that at no time did the defendants freely and frankly discuss with
the plaintiff's testator the value of his interest in the estate, which the instrument
in question purported to assign.

*Held,* that while the general rule is that the burden of establishing fraud rests
upon the parties alleging it as a ground for defeating a contract, still where,
as in this case, the relations between the contracting parties are of such a
character as to render it certain that they do not deal on terms of equality,
but that either on the one side, from superior knowledge of the matter derived
from a fiduciary relation or from over-mastering influence, or, on the other,
from weakness, dependence, or trust justifiably reposed, unfair advantage in
the transaction is rendered probable, the burden is shifted, the transaction is
presumed void, and it is incumbent upon the stronger party to show affirmatively
that no deception was practiced, no undue influence was used, and that all was
fair, open, voluntary and well understood, and under such circumstances, if the
burden is not met by the stronger party, constructive fraud may be found.

At the time of the execution of the assignment plaintiff's testator was dependent
upon and subject to the control of the defendants and he did not deal on
terms of equality with the defendants and their attorney but placed confidence
in them and signed the paper writing induced thereto by deception and con-
cealment. Under the facts of the case the paper when executed was not
understood by plaintiff's testator and its execution was not his free and voluntary
act and he did not thereafter ratify or confirm it.

Since the defendants have not met the burden of showing freedom from fraud in the transaction, the assignment will be set aside.

COCHRANE, P. J., and HINMAN, J., dissent, with opinions.

APPEAL by the plaintiff, The First National Bank of Coffeyville, as executor, etc., from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of Washington on the 6th day of March, 1923, upon the decision of the court, rendered after a trial before the court without a jury, dismissing the complaint.

*Rogers & Sawyer* [*John E. Sawyer* of counsel], for the appellant.

*Heaton & Mambert* [*Alvin E. Mambert* of counsel], for the respondents.

VAN KIRK, J.:

The action is brought to have vacated a certain paper writing in form transferring to the defendants all the interest of Perry Willett in the estate of Arthur Willett in consideration of one dollar and an agreement that the defendants would support, care for and bury Perry Willett, the original plaintiff. Perry Willett died before the trial and this plaintiff was substituted. Perry Willett was one of two uncles who survived and were the only next of kin of Arthur Willett who died intestate.

The real parties in interest are Perry's great grandnephew William Perry Bigelow, named after him, and the defendants, two of several nephews and nieces. Perry Willett made a will in 1905, in which he gave his property to this great grandnephew, who lives in Kansas. In 1919 he made another will, making the same disposition of his property, but naming the First National Bank of Coffeyville as executor in place of the person who had been named and giving a power of sale to the executor. This great grandnephew and his parents had in earlier years lived with Perry Willett and he apparently was very fond of the young man. Perry Willett's one brother who had survived Arthur died within about one month after Arthur died and Perry's nearest heirs at law and next of kin at the time of his death were nephews and nieces of different degrees. The defendants are brother and sister. During the years when the Bigelows came into Perry's life, that is during the forty years he lived in Kansas, he was having no communication with and apparently knew nothing of these other relatives, and they were, until shortly before his death, entirely indifferent to him.

The testimony of Perry Willett was taken by deposition. As evidence of facts recited this testimony and certain declarations

made by Perry Willett to, or in the presence of, parties interested should generally be disregarded; they are hopelessly contradictory and simply disclose the condition of the man. Later reference to the evidence we think will show that he was entirely dominated and under the influence of those with whom he happened to be; he testified and talked in harmony with their wishes and suggestions. We must look for the facts of the case in the circumstances and in the testimony of other witnesses.

Some forty-two or forty-three years before his death Perry Willett had purchased a mortgage upon lands in Kansas, knowing nothing more about those lands than the description in the mortgage and probably the statements of the man who sold it to him. Because he had weak lungs and dreaded the cold winters in the east, taking the mortgage procured in such a simple and innocent manner, he went to Kansas, sought out and identified the land, procured a deed and ever since lived there. He was never married. At the time of his death in 1920 he was ninety-three or ninety-four years of age. He had but little education. He had a considerable recollection of the events of his earlier life, but a poor memory of passing events. He was frail in body and health. He had lived in Kansas the forty years next prior to 1920. He had gained friends in his neighborhood and in 1919, under the advice of these friends, he had given to the First National Bank of Coffeyville (the executor of his will) a power of attorney to look after his business affairs. His attorney in fact procured tenants on his farm, who were to support and look after him. The cashier of this bank did the business and says that Perry was well looked after and comfortable. The Bigelows had moved away to a place more than 100 miles from his home. Strangers had not given much attention to his person. Perry at that time knew little about his money or business affairs. He stated that he had been robbed of much personal property, though there is no proof that his statement was founded on fact.

It was at first supposed that the cousins of Arthur were his next of kin and heirs at law; but it was later comprehended that the uncles were the next of kin and inquiries for them were made. At length a letter came from California stating that Uncle Perry was living in Coffeyville, Kans., and that John Bigelow reported that Perry was " childish and quite feeble." On the afternoon of the day this letter was received, the defendant John Wright, his brother Sam and his attorney, Pratt, started for Kansas. Pratt says that Arthur Willett's estate had some interest in a second story of a building in Oklahoma, and that these three men were incurring the expense of a trip west, John at least being a man of almost

no means, in order to investigate this property, as well as to see Uncle Perry. If so, they quickly abandoned the search for property. They arrived in Coffeyville and immediately drove to the farm of Perry Willett. They found him. John asked him to go to Coffeyville with them. He readily consented and went in the clothes and uncleanliness in which they found him. Though Perry's relatives in New York had not written to him or taken any interest whatever in him for more than forty years, yet, on the simple suggestion of John Wright in 1920, he was ready to leave his home and return to Washington county, N. Y., which he had left because he dreaded the winters there. And later, with equal willingness, he returned to Kansas when his great grandnephew suggested it. Pratt and the nephews, in Coffeyville, inquired from a real estate agent concerning the value of his farm and a lot which he owned in town. They went late in the afternoon of the same day to the banks and in one of the banks at least Pratt procured a copy of his account. This bank was Perry's attorney in fact. There is testimony that they desired to draw sufficient money to buy him clothes and pay his fare to Washington county, but the cashier told them he would like to know more about the affair before the money was drawn; that they left, stating they would return in the morning. They did not return, but on the other hand took a train immediately for Washington county; this was the evening of the day they found him. Pratt furnished the money for his expenses, but they bought him no clothes and they did not clean him up. They reached Cambridge Saturday, June 19, 1920. Pratt's son says he was astonished to see them back so soon; and, although he had never seen Perry Willett, he knew it was Perry because they had gone out to see him. The feeble old man was taken immediately to the home of these defendants. They did not clean him up; they did not furnish him with any new or clean clothes. Five days later Pratt, who had not in the meantime seen Uncle Perry or heard from him, appeared with four copies of the paper writing in question in this action, completed in the form in which it was executed. It seems that in Kansas something had been said about Perry living on skim milk and cabbage. When Mr. Pratt came in, he said to Perry, who in the meantime had been ailing with stomach trouble and was unkempt and uncared for, that he had prepared a paper providing that he should no longer live on " skim milk and cabbage," and that he should have a woman's care through life and a Christian burial. Not a word about a transfer of his interest in the Arthur Willett estate, not a word about anything he was to give up or pay for such care and attention and not a word to these defendants as to whether or not they would assume the obli-

gation on their part to be performed. Without further explanation Pratt asked if Perry desired to have the paper read. He said he did. He could not read. Pratt says that he thereupon read it in a clear distinct manner and Perry said it was just as he wanted it. John and his sister have added that he said he did not want anything from the east, that he had all that he wanted in the west and he did not come out here for any money. Although Pratt was a notary public, Dr. Ingraham, a notary public, was then sent for. Dr. Ingraham had known Perry before he had gone west. He says Perry looked like a tramp, dirty and unkempt, although he had been for five days with these people who were about to covenant to care for him and keep him clean; that Perry talked frankly and readily about earlier associations in the east; that he thinks Perry was rational and sane and capable of understanding the transaction. The paper was again read over in the presence of Dr. Ingraham and Perry reiterated that it was just as he wanted it, although he had never heard of it before, and never thought of such a paper and of course never knew till then that he wanted it. As will appear later, he had no definite appreciation of what he was transferring to buy his maintenance and Christian burial. During the execution of this paper no suggestion was made to Perry that he should have counsel or advice or talk with any friends.

We pass now to what knowledge or means of knowledge Perry had as to Arthur's estate. Pratt and the two brothers say that, in Kansas and on the trip back, they told him that Arthur was dead; that the two uncles, Perry and his brother John of Chautauqua county, N. Y., survived him; that Arthur's estate was in bad shape, much confused; that Arthur's father and mother had died, and there had been no inventories or statement of the amounts of their estates, but these were in Arthur's hands and mixed with his property; and that there was a claim against Arthur's estate of $18,000, but that would be fought to " the last ditch." Later they told him that the inventory of Arthur's estate was about $30,000. They never told him that Arthur's estate in fact inventoried $40,000, and, if any deduction was to be made on account of other estates mingled with it, that deduction should come out of the $40,000, and not out of the $30,000; or that Arthur's father had died intestate and whatever personal property he had went to Arthur; or that he, Perry, was the owner of one-half of the personal property of Arthur's estate. The evidence very plainly discloses that if Uncle Perry had intelligence enough to comprehend such a transaction, sufficient facts were not furnished him so that he knew what he was doing or so that he could make any reasonable estimate

of the amount he was to transfer to these defendants. His own expression, just before he signed the paper, as stated by Pratt, was " if there was anything he wanted to *give* it to John and to Kate, and that he wanted to sign that paper."

In our view the evidence discloses a distinct deception as to a principal element in the transaction. There never was any fair and frank statement to Perry Willett of the amount of Arthur Willett's estate, or of his expected share in it. Because he was told that Arthur Willett left surviving him two uncles, it cannot be presumed that he knew that he was entitled to one-half of Arthur's personal estate, since the attorney for the defendants did not know this for some time after the administrators of Arthur's estate were appointed. Neither the defendant John nor his brother Sam claim that they advised Uncle Perry what his rights were in the estate; and, from the testimony of the defendant Katherine, the inference is that she did not advise him until after the papers had been executed and then only indifferently. The defendants would have it inferred that they told Perry that the amount of the inventory of Arthur's estate was $30,000, because there was some $8,000 or $10,000 of his mother's estate mingled with his; but they did not tell this to Uncle Perry. When they told him of the $18,000 claim for damages, adding that they were going to fight it to the " last ditch," they very plainly gave the impression that it was a serious claim. Deducting from $30,000 the estate of Arthur's mother and the $18,000 claim, there would not be much left in Arthur's estate to pass to any next of kin. It was his interest in Arthur's estate that was transferred to these defendants by this paper writing; and consequently it was of the greatest importance in fair dealing and honesty and in order that there be no deception, that he should be told frankly and fairly what the circumstances of that estate were and what his interest therein was before he was asked to sign the paper. These circumstances certainly furnish more than the slightest proof that an advantage was taken of the old gentleman and that more than the " least speck of imposition " was practiced upon him. (See *Cowee* v. *Cornell, infra.*)

Fraud vitiates all contracts, and it is the general rule that the burden of establishing the fraud rests upon the parties alleging it as a ground for defeating a contract. But there is an exception to this rule as generally recognized, which is stated in *Cowee* v. *Cornell* (75 N. Y. 91, 99) as follows: " Whenever, however, the relations between the contracting parties appear to be of such a character as to render it certain that they do not deal on terms of equality, but that either on the one side from superior knowledge

of the matter derived from a fiduciary relation, or from over-mastering influence, or on the other from weakness, dependence, or trust justifiably reposed, unfair advantage in a transaction is rendered probable, there the burden is shifted, the transaction is presumed void, and it is incumbent upon the stronger party to show affirmatively that no deception was practiced, no undue influence was used, and that all was fair, open, voluntary and well understood." Under such circumstances, if the burden is not met by the stronger party, constructive fraud may be found. We have not here one of the usual cases of confidence placed and influence exerted, in which it is presumed that the parties dealt under terms of inequality, but rather a case in which the inequality is shown by the facts and circumstances of the case, and to such a case the same exception applies. In *Smith* v. *Kay* (7 H. L. Cas. 750; cited, 13 C. J. 407) it is said: " The relations with which the Court of Equity most ordinarily deals, are those of trustee and *cestui que trust,* and such like. It applies especially to those cases, for this reason and this reason only, that from these relations, the court presumes confidence put and influence exerted. Whereas in all other cases where those relations do not subsist, the confidence and the influence must be proved extrinsically; but where they are proved extrinsically, the rules of reason and common sense, and the technical rules of a court of equity, are just as applicable in the one case as in the other." Also the circumstances of a case may be of such a character " if not sufficient to shift the presumption, at least to authorize a setting aside of a contract without any decisive proof of fraud but upon the slightest proof that advantage was taken of the relation, or of the use of ' any arts or stratagems or any undue means or the least speck of imposition.' " (*Cowee* v. *Cornell, supra,* 101.) Where the circumstances justify it, the law will interpose " by adjusting the quality and measure of proof to the circumstances, to protect the weaker party and, as far as may be, to make it certain that trust and confidence have not been perverted or abused." (*Matter of Smith,* 95 N. Y. 516, 523. See, also, *Barnard* v. *Gantz,* 140 N. Y. 249, 259.) The general rule as to undue influence as stated in Story's Equity Jurisprudence (2d ed. § 238) is: " The doctrine, therefore, may be laid down as generally true, that the acts and contracts of persons who are of weak understandings, and who are thereby liable to imposition, will be held void in courts of equity, if the nature of the act or contract justify the conclusion, that the party has not exercised a deliberate judgment, but that he has been imposed upon, circumvented, or overcome, by cunning, or artifice, or undue influence." This rule is applicable to all cases where the relation

between the parties gives one a controlling influence over the other. (*Sears* v. *Shafer*, 1 Barb. 408; affd., 6 N. Y. 268.)

We think under the circumstances of this case the defendants were required to make explanation and that " without any decisive proof of fraud " the duty rested upon them of satisfying the court that the making of the contract was the free and intelligent act of Perry Willett and that the contract was procured without overreaching and without deception on their part, and was such as a court of equity can approve. One cannot read this record without being strongly persuaded that Perry Willett, suddenly called upon to act without counsel or advice, did not deal on terms of equality with these defendants and their attorney. The defendants were represented by counsel. Evidently the defendants knew beforehand the contents of the paper; it is the fair inference that it was the result of a plan agreed upon between them and Pratt, perhaps Sam being their instrument. We repeat that, when Pratt stated to Perry what the paper was, he did not mention in any way the obligations which the defendants were called upon to assume under the proposed contract. He did not ask them if they were satisfied; it seemed at once to be thoroughly understood by every one except Perry. We must accept the conclusion that Pratt was acting solely for these defendants and not at all for Perry Willett. The facts and conditions above recited leave the firm impression that Perry was a dependent old man, who relied upon other people for " maintenance and guidance and cleanliness," as expressed by Forest Kenyon, a witness for the defendants, and that he, without personal choice, trusted, and took his views from, those relatives with whom he was at the time and acted as they suggested.

This paper was prepared at the sole instance of the grantees, the grantor never having had it submitted to his consideration. This circumstance renders it subject to suspicion and " ' raises a presumption of fraud. * . * * For where an instrument is prepared by direction of the party who seeks advantage from it, and the other party has no person with whom he consults on the subject, * * * a great degree of jealousy attends the instrument.' " (*Sears* v. *Shafer, supra,* 415.)

There is another bit of evidence in the case. On the same day the contract was made Perry Willett acknowledged the execution of a waiver of the service of a citation upon him to attend the judicial settlement of the accounts of the administrators of Arthur Willett's estate; and therein it is recited, " I do hereby consent and request that a decree may be entered herein settling the said account as verified by the said Samuel P. Wright and Howard M. Hall, or either of them, whenever the same shall be presented to the

said court for that purpose." The circumstances of the execution of this paper we do not find related anywhere in the evidence. It is not mentioned, as far as we can find, in the testimony of any witness. Under this paper there was a substantial assurance that, whatever the amount of the estate and whatever developed upon the accounting, no information thereof would come to Perry Willett. The whole transaction was intended to be tightly closed.

We believe the cause of action above discussed is within the allegations of the complaint; but if there is evidence tending to establish a cause of action broader than that alleged such evidence was received without objection thereto.

In the complaint plaintiff " offers to return to defendants all that he received under, or as a consideration for said assignment."

The judgment should be reversed, with costs, and the case returned to the trial court to determine what amount should be paid to defendants for moneys expended, services rendered or expenses incurred in behalf of Perry K. Willett under or as a consideration for the assignment.

We disapprove of findings 8, 12, 25, 28, 30, 31, 37, 44, 45, 46, 47, and find that, at the time of the execution of the assignment, Perry K. Willett was dependent upon and subject to the control of the defendants; that he did not deal on terms of equality with the defendants and their attorney; he placed confidence in them and signed the paper writing induced thereto by deception and concealment; that the paper when executed was not understood by him and its execution was not his free and voluntary act, the result of his deliberate judgment; that he did not ratify or confirm the assignment after its execution; that the assignment be set aside; and that the plaintiff recover from defendants any money or property received by them by virtue of such assignment.

All concur, except COCHRANE, P. J., and HINMAN, J., dissenting, each with a separate opinion.

COCHRANE, P. J. (dissenting):

The action was originally begun by Perry K. Willett. After his death the present plaintiff was substituted. The original plaintiff naturally would not and legally could not effectively allege in his complaint his own incompetency. He did not attempt to do so. The gravamen of the action is fraud and undue influence. (See *Aldrich* v. *Bailey*, 132 N. Y. 85.) While there is a general allegation of fraud the complaint specifies with considerable particularity that such fraud consisted in stating and representing to the plaintiff that the paper he signed related to the estate of Franklin Willett.

34

The complaint then alleges that it was upon these latter statements and representations that the plaintiff was " induced to execute said transfer, conveyance or assignment." There is no evidence, as I view it, sustaining these allegations of the complaint. There was no request for its amendment. It is fundamental that a recovery must be according to the allegations and the proof. The trial justice dismissed the complaint. I find no proof sustaining its allegations, and, therefore, I think the judgment should be affirmed.

Hinman, J. (dissenting):

I have not been persuaded by the prevailing opinion in this case. It overlooks elements in the case which are undoubtedly established by most credible testimony which as a starting point furnish the foundation for the giving of credence to the defendants' theory of this whole transaction. Mr. Justice Van Kirk likewise brushes aside all of the testimony of Perry Willett, whereas it seems to me that testimony should be carefully considered because it clouds the whole of the plaintiff's case and discredits it utterly. The majority of the court have reached a conclusion which is absolutely contradictory to the theory of Perry Willett when he brought the action. They have decided the case upon a theory foreign to that expressed in the complaint and to that upon which the plaintiff tried the case throughout. Because a recovery is now being allowed in violation of the rule of *secundum allegata et probata,* I fully concur in the opinion written by Cochrane, P. J. Moreover, I wish to express my dissent upon the facts.

Perry Willett's testimony taken upon open commission tells a story which is not incoherent or inconsistent with itself but which is consistently false and in many material details as shown by the testimony of disinterested witnesses, like Dr. Ingraham, Thomas O'Brien, Forest Kenyon and others.

In view of this wholly incredible testimony on the part of Perry Willett and the disinterested testimony as to just what took place at the time of the transaction and as to the apparent satisfaction that he expressed during his two months' stay there with the kind of home that he had obtained and was enjoying, it seems clear to me that Mr. Justice Van Kirk has placed the emphasis in the wrong place and that a reversal of this judgment would be doing a great injustice.

I am thoroughly convinced that Perry Willett understood just what he was doing; that he did just what he wanted to do at the time and that he had all the knowledge that he cared to possess when executing the agreement. He simply suffered a change of

heart after he returned to the west. It is uncontradicted by Judge Rogers or any one that Perry told the judge in a conference with him after Bigelow's first visit to the east " that he had assigned it to who he wanted to and it was going where he wanted it to go." Dr. Ingraham, the disinterested notary public, who was evidently a man of fine standing in the community, not only contradicts Perry Willett absolutely as to what took place but as a physician, competent to judge and having no interest, he testifies that Perry Willett was an unusual man for his age; that he talked perfectly rationally and said: " I don't see how a man could talk in detail as he did about affairs so rationally and sanely and not know enough to understand that simple paper when it was read to him in a clear and distinct voice." Thomas O'Brien, another disinterested witness, who had been an old friend of his, testified that he had had conversations with him during his stay in the east and that Perry told him that he did not wish to go west but he dreaded the winter. He said he was used well and had a good home. He told him he was sorry for John Wright, who was blind and poor. He testified that Perry was just as good as he was forty years before for anything he saw. Pratt, the attorney, and Forest Kenyon are corroborated in so many particulars by these disinterested witnesses as are also John and Katherine Wright that there is not the slighest reason for discrediting their testimony as a whole. Whereas if the doctrine of *falsus in uno, falsus in omnibus* should ever be applied, it should be applied to the testimony of Perry Willett.

There is absolutely no testimony to show that Perry was dependent, physically or mentally, upon those present at the time of the transaction, or that he was in any way subject to their control. He was not weakened in mind or body by disease or mental infirmity. This action was not brought upon any theory that Perry Willett was incompetent to manage his affairs. If so, a committee should have been appointed to bring the action for him. Moreover, in August of the previous year he had made a will and one of his own witnesses, Mr. Wettack, cashier of the bank at Coffeyville, said that at that time Perry had sufficient mental capacity to understand the nature and character of his act, the amount of his property and the objects of his bounty. His act in making this assignment to John and Katherine Wright did not take the property away from the natural objects of his bounty. There was no more reason for his leaving this property to Bigelow than to John and Katherine Wright. He had known John from boyhood and had expressed great sympathy for him because of his blindness and he expressed the same feeling to

disinterested witnesses at the time he was living with the Wrights subsequent to this transaction. The Bigelows had been living 100 miles from him for ten to twenty years. They had never invited him to come to their home in Augusta to visit them during that time and very seldom had Bigelow been there at Coffeyville to see him. Bigelow had manifested no interest in him and as Perry expressed it to one of the disinterested witnesses, Bigelow had not even come to his assistance when his cattle had been stolen from him. He characterized Bigelow as a "skunk" in such conversations. He called him a gambler and a bootlegger and in fact it is undisputed that Bigelow was running a poolroom at the time of the trial and had been for many years engaged in that business. The Wrights did not even know that Perry was alive during the forty years that Mr. Justice VAN KIRK says they were indifferent to him. On the other hand, the Bigelows did know that Perry was alive and they were actually indifferent to him until they saw the likelihood of losing some money which they had not expected him to have. When they succeeded in running away with him after two visits to the east, they took him to their bosom and made life very pleasant for him at Augusta. They had never done this before, although they knew of his condition, which the Wrights did not. Perry. Willett in his own examination admitted that he was very glad to see John Wright when he came to Coffeyville because, to quote his own testimony, " I had no friends out there."

Moreover, we must not lose sight of the fact that this assignment of his interest in Arthur's estate was not a gift, but as he expressed it to one of the witnesses, it was a " trade." There is no reason to believe that the arrangement was not what ought to have been for his own best interests, namely, to live with relatives who did and would care for him rather than to live with a tenant on his farm and save whatever interest he had in Arthur's estate for the benefit of a relative who for many years had taken no care of him and who suddenly became personally interested and pretended to care for him and led him away from Cambridge by some deception so that he could be the more likely recipient of Perry's bounty. Too little importance is given to all of this by Mr. Justice VAN KIRK, who places his chief reliance upon a conclusion that Perry's appreciation of what he was transferring was too indefinite. I believe that Perry knew all that he wanted to know; that apparently he was not interested in the amount of money due him from Arthur Willett's estate. What he wanted at the time was a woman's care and a comfortable home. Of what interest was money to him at the age of ninety-four, when he had plenty for

his needs in the west? His years were numbered and very few at best. He could not spend the money upon himself. He could only save it for Bigelow, who had already been made the legatee of all of his western property. Too little importance is given by Mr. Justice VAN KIRK to this promise of care and a home, which to one in his situation was better than a fortune. No matter what the amount of Arthur's estate, he wanted to give it to John and Kate with whom he had never had a disagreement and for whom he had always had the kindliest of feelings and sympathy, particularly John because of his affliction. If he did not care about the amount of Arthur's estate sufficiently to inquire in any more detail than he did, why should we give it such importance and call it an imposition upon him? He lived with the Wrights for two months thereafter and admits that the neighbors talked to him about Arthur's estate. It is clear from disinterested testimony that he talked with others about it including Judge Rogers and did not complain until after he had returned to the west and was under the influence of the Bigelows. He wanted "things comfortable" and he was getting them at the home of the Bigelows at the time he started the action, although this was the first time he had obtained the same at their hands. He admits in his cross-examination that he would rather be on his farm at Coffeyville than with the Bigelows if he could have things comfortable. He says: "If I could have things comfortable I would like to be on the farm." What appealed to him at the time of his examination may be presumed to have had a great appeal for him at the time of the transaction in question. Surely we cannot say that consideration was lacking or inadequate in the transaction in question. He had no reason to believe that the Bigelows would do this for him because they had failed to do it for many years with full knowledge of his situation. When the Bigelows came the second time they probably succeeded in convincing him that he could have the same comfortable home with them in the west without having to suffer the rigors of the climate of the winters in the east. He, therefore, changed his mind.

For all of these reasons, I feel compelled to dissent and to vote for an affirmance of the judgment.

Judgment reversed on the law and the facts, with costs, and the case returned to the trial court to determine what amount should be paid to defendants for moneys expended, services rendered or expenses incurred in behalf of Perry K. Willett under or as a consideration for the assignment. The court disapproves of findings of fact 8, 12, 25, 28, 30, 31, 37, 44, 45, 46, 47, and finds that at

the time of the execution of the assignment Perry K. Willett was dependent upon and subject to the control of the defendants; that he did not deal on terms of equality with the defendants and their attorney; he placed confidence in them and signed the paper writing induced thereto by deception and concealment; that the paper when executed was not understood by him and its execution was not his free and voluntary act, the result of his deliberate judgment; that he did not ratify or confirm the assignment after its execution; that the assignment should be set aside; that the plaintiff recover from defendants any money or property received by them by virtue of such assignment.