BRONX COUNTY TRUST COMPANY and Another, as Administrators, etc., of ELLEN CAMPBELL, Deceased, Plaintiffs, *v.* FRANCES H. O'CONNOR, Also Known as FRANCES H. FLANAGAN, and Others, Defendants.

BRONX COUNTY TRUST COMPANY and Another, as Administrators, etc., of ELLEN CAMPBELL, Deceased, Plaintiffs, *v.* FRANCES H. O'CONNOR, Also Known as FRANCES H. FLANAGAN, and Others, Defendants.

Supreme Court, Bronx County, June 5, 1928.

Executors and administrators — accounting — action to set aside gifts of proceeds of certain securities owned by decedent and deed of trust of certain other property, on ground defendants exercised undue influence — proof shows defendants induced decedent, who was fatally ill, to execute deed of trust and certain stock powers — defendant who was not beneficiary under trust is competent witness in trust action, though not in gift action, within meaning of Civil Practice Act, § 347 — defendants have not sustained burden of proof that gifts and transfers to them were free and voluntary acts of decedent — plaintiffs are entitled to judgment.

Plaintiffs are entitled to judgment in these actions to set aside the gifts of the proceeds of certain securities owned by decedent and a deed of trust of certain of the property of decedent, as well as for an accounting. The basis of the actions is that undue influence was used in bringing about the gifts and the execution of the deed of trust, and the proof not only shows that defendants induced decedent to move from the home of one of her nieces to their apartment at a time when she was fatally ill with cancer and so feeble as to be unable to raise herself in bed without assistance, but also that, though her condition

became rapidly worse, a short time before her death the corporate stock, possession of which was in defendants, was sold by a brokerage house, in which one of the defendants was employed, upon the authority of a letter written by one of the defendants and signed by decedent, and the proceeds divided among them.

The acts which inured in favor of defendants, such as the execution of the stock powers, the deed of trust and the destruction of a so-called will, occurred while decedent was lying helpless in bed. While the proof does not show any deliberate intention to defraud, the defendants have failed to show that the gifts and transfers in their favor were the free and voluntary acts of decedent, and consequently plaintiffs are entitled to judgment.

One of the defendants, though a beneficiary of the acts of the others, not being a beneficiary under the trust, was fully competent, under section 347 of the Civil Practice Act, to testify in the trust action in respect to communications with the decedent which concerned the trust. Another of the defendants was similarly relieved of the prohibition of section 347 of the Civil Practice Act, where she was not directly benefited in law by any of the transactions.

However, the defendant who was the chief beneficiary, and who executed the transaction in behalf of the other defendants and herself, cannot complain because she is deprived by statute of the privilege of describing everything which happened in the sick room and placing the most favorable construction upon her own acts and defaults.

Where inequality exists and suspicion of unfair treatment of the weaker party by the stronger is present, the burden is on the latter to clear up the suspicion and show affirmatively that no deception was practiced, no undue influence used, and that all was fair, open, voluntary and well understood. This burden has not been sustained by the defendants.

ACTIONS by administrators in which the first complaint alleges (1) conversion of certain securities and their proceeds; and (2) gifts of the proceeds of the same securities to the same individuals, and seeks to set aside such gifts and compel an accounting. The second complaint alleges undue influence and seeks to set aside a deed of trust of certain other property of the deceased.

*Deiches, Goldwater & Flynn* [*Monroe Goldwater* of counsel], for the plaintiff Bronx County Trust Company.

*Mencher, Sacher & Mencher* [*Harry Sacher* of counsel], for the plaintiff Mary A. Haas.

*Ely & Price* [*Martin Conboy, Richard Ely* and *Guernsey Price* of counsel], for the defendants Frances H. O'Connor and Madelon R. O'Connor.

*Humes, Buck & Smith* [*Albridge C. Smith* and *Milward W. Martin* of counsel], for the defendant New York Trust Company.

McCOOK, J. Plaintiffs Bronx County Trust Company and Mary A. Haas, as administrators of the estate of Ellen Campbell, deceased, bring two actions. One is against the nieces of Ellen Campbell, Frances H. O'Connor (later Mrs. Flanagan, then Mrs.

Supreme Court, June, 1928.    [Vol. 132

Lamberti) and Madelon R. O'Connor; the other against Frances and the New York Trust Company. Frances V. O'Connor, sister of deceased and mother of Frances and Madelon, who also is an administratrix, refused to join as party plaintiff and for this reason is made a codefendant in each case. Mary A. Haas, plaintiff, is also a sister of deceased. The first complaint alleges (1) conversion of certain securities and their proceeds by Frances and Madelon; and (2) gifts of the proceeds of the same securities to the same individuals and seeks to set aside such gifts and compel an accounting; the conversion was not proved and will not be further discussed. The second, also alleging undue influence, seeks to set aside a deed of trust of certain other property of deceased. These actions have been tried together and will be considered together here, although somewhat different rules of evidence apply. For example, Madelon, not being a beneficiary under the trust, is competent on all heads as a witness in the trust action, though not in the gift action. Miss Ellen Campbell, the deceased, had been a member of a large family, of whom her brother Daniel J. Campbell, her benefactor through bequests of nearly $400,000, was the most successful. After Daniel's death such of the survivors as were conveniently located appear to have turned to Ellen as the moneyed member and she from time to time distributed gifts to them with a generous hand. By the first or second month of 1926 the score was approximately as follows: Mrs. Frances V. O'Connor, sister (codefendant), $10,000; Mrs. Alma Schneider, niece, and daughter of Mrs. Haas, $18,000; Al Haas, nephew, and son of Mrs. Haas, $5,000; Mrs. Mary A. Haas, sister (plaintiff), $10,000; Madelon and Frances, nieces, and daughters of defendant Mrs. Frances V. O'Connor (defendants), $15,000 each; Howard O'Connor, nephew, and son of defendant Frances V. O'Connor, $5,000. Mrs. O'Connor has another daughter, Marguerite (later Mrs. Frenz), the amount of whose gifts from deceased is not shown, but it appears that she cost her Aunt Ellen in litigation altogether $49,000. Mrs. Haas has another daughter, Sadie (Mrs. Kaplan), who appears to have received gifts of $50,000. Each side draws certain inferences from these figures, which thus become of importance. The nieces Marguerite, daughter of one of the defendants and sister of two others, and Sadie, daughter of plaintiff Haas, appear to have figured successively as the particular favorites of their Aunt Ellen, who had peculiarly close relations with them and lived with them, the former from 1916 to 1924, the latter from 1924 to 1926. The sad and sordid story of the straining of these formerly close relations and their final rupture is hinted at by various witnesses. If fully told it might furnish a key to several obscure problems of the case. Neither Marguerite

nor Sadie was called as a witness for either side. On May 10, 1926, Miss Campbell left Sadie and took up her residence with Mrs. O'Connor and Frances, who were two days afterwards joined by Madelon; there she remained until her death on June twenty-fourth of the same year. It is with the events of these last six or seven weeks of her life that we are chiefly concerned, although her condition of health and her relations with the various members of her family preceding her final removal are also drawn in question. At this time (May and June, 1926) Miss Campbell's sole surviving blood relatives entitled in the absence of a will to share in her estate were her sisters, Mrs. Haas and Mrs. O'Connor, also her sister Mrs. Hogan, who lived in Georgia; possibly also two brothers, though these brothers had not been heard of for many years and were probably long since dead. Mrs. Hogan has since died. That her sisters, Mrs. Haas and Mrs. O'Connor, and her nephews and nieces already mentioned were all possible recipients of bounty through will, deed or gifts is shown by the fact that they had all at one time or another been in that position, mostly at recent dates. Up to the time of her removal to the new home of the defendants, she had treated the relatives who lived in the neighborhood of New York with impartiality, apart from Marguerite and Sadie. These two were then alike in the position of having specially profited to about the same extent and of having quarreled with her. It would appear that each member of the family had a fairly good idea how much every other had received. Miss Campbell was upwards of seventy-three years of age when she died. It is not asserted that she was of unsound mind, but that her nieces Frances and Madelon administered to her, with the aid of a physician, certain drugs which affected her mentality and made her more susceptible to their influence. In spite of some partial denials by the defendants, their adversaries have established that codeine, in capsules of one-half and one grain each, was prescribed for her by the doctor and given by the defendants, usually Frances, to her. According to expert testimony this drug in considerable quantities, say of two grains and more at a time, might have clouded her mind, but there is no convincing evidence that any such quantities were in fact taken at one time by deceased, or that her mind was in fact clouded by these capsules or any other medicine at any time. This particular charge is, therefore, in my judgment to be eliminated, although the necessity for the use of the drugs to alleviate her sufferings, the period during which they were administered, and the lack of frankness of the defendants in their testimony about the matter furnish at once some measure of the patient's physical and mental condition and of the conduct and opportunities

of the defendants in relation to her. The defendants admit that Miss Campbell was somewhat hard of hearing, though they claim she varied in this respect. In my view they greatly understate the seriousness of this impediment. One of their own witnesses, the lawyer Andrews, says that in talking to her he was obliged to speak with at least twice the loudness of his court voice, and that Frances addressed her in a tone twice as loud as that employed in talking to him. As her illness progressed she became deafer. The disease of which she died, and from which she had long been suffering, certainly ever since October or November, 1925, was carcinoma (cancer). She was bedridden at latest from January, 1926. Her physical condition, three days after her removal from the Kaplan home to the O'Connor apartment, was diagnosed by the physician employed by the defendants as " inoperable " and " inevitably fatal." He described her at this time as " a weak old woman," and did not deny that she was dying during these forty-five days. Whatever influence was brought to bear upon her must, therefore, be judged by its impact upon the obviously limited mental and physical capacity of a fatally sick old woman, so feeble as to be unable to move out of bed or even to raise herself in bed without assistance, decidedly deaf, and at the last in almost the article of death. The first item of influence is the alleged inducement of her to leave Sadie and go to Frances. Defendants deny any such inducement, saying that the invalid herself asked for the change because of Sadie's neglect and meanness, and the inferior quality of her apartment. Discounting as one may, and under the circumstances in some degree must, the testimony of Mrs. Haas and other witnesses for plaintiffs, there are certain undisputed facts which stand out in this connection. In the late fall of 1925, if not sooner, the defendants suspected, if they did not know, that Miss Campbell was suffering from cancer. If their own version is to be accepted, the plan to establish a home for her and move her there was made some time before its execution, possibly several months. Mrs. O'Connor was then living with Frances, Madelon by herself. All three were poor except for the gifts already received from Miss Campbell. Mrs. O'Connor had been a seamstress, but was no longer working. Madelon was a telephone operator with a firm of brokers, Nickerson & Co. Mrs. O'Connor took a lease of the new apartment on the Grand Concourse in her own name, was joined immediately by Frances and a few days after by Madelon. Upon their own admissions they at first believed that Miss Campbell, who had been defeated in an attempt to recover $22,000 from Marguerite by action and was being sued in turn by Marguerite for a very large sum of money,

would lose all her property as a result of the litigation; they learned later that she would not, apparently just before the taking of the new apartment. There is some evidence Frances knew that the physician employed by Sadie had advised against removing the old lady, and indeed had warned Miss Campbell that such removal might hasten her death. Much was made by the defendants upon the trial of the contrast between the small, dark and uncomfortable quarters furnished by Sadie and the larger, lighter and more attractive surroundings of the Grand Concourse. It is probable that such a contrast existed and that Miss Campbell was made more comfortable at the new apartment than she had found herself at the old. It is also probable that Sadie, contrary to the testimony of her mother, Mrs. Haas, had taken a house at Long Beach and ultimately went there. If she intended to move to Long Beach for the summer, since she had children it would have meant either the abandonment or removal of her aunt for that period. These things, however, upon my theory, do not help the defendants, for the more attractive they made the new proposition, the more it was calculated to allure the invalid, and the better were the defendants armed, whether they foresaw this effect or not, for any subsequent undertaking in their own interests to deprive their other relatives, and especially Sadie, of Miss Campbell's favor and regard. We now return to the events of May 10 to June 24, 1926. The removal on May tenth was effected by stretcher and ambulance. From that moment Frances remained with her aunt substantially all the time, acting as her nurse and personal attendant, with some help from Mrs. O'Connor. Madelon continued at the brokers' office, assisting occasionally at home outside working hours. The room where the invalid lay contained a commode three feet or so distant from the bed; on this when necessary she was helped to sit. Apart from such occasions she did not leave the bed. Her trunk was also removed from the Kaplan apartment and placed in the same room beyond reach of her bed. In this trunk were found her clothes and personal property in general, together with the securities which form the subject of these actions. It is beyond dispute that she never approached the trunk herself or took out any of its contents, which were removed by one of the three O'Connor defendants, as they claim by specific instruction and request of Miss Campbell. These securities included the following, all received from Daniel J. Campbell under his will: 4,252 ordinary shares British-American Tobacco Co., Lim., 794 shares Imperial Tobacco Co., Lim., 666 shares American Tobacco Co., 2 shares P. Lorillard Co., preferred, and 200 shares of Gold Mine stock. On May 24, 1926, Madelon carried to the office of Nickerson & Co.,

where she was employed, 4,252 ordinary shares of British-American Tobacco Co., Lim., stock and 794 shares Imperial Tobacco Co., Lim., stock, and on the same day a letter went to one Heymann, a lawyer who had been Miss Campbell's personal attorney. On May twenty-sixth a letter was delivered or mailed by Madelon to Nickerson & Co. instructing them to sell the stock and distribute the proceeds between Madelon and Frances. On May twenty-eighth Nickerson & Co. wrote to Miss Campbell acknowledging the receipt of the stock and saying they would distribute the proceeds. The letters to Heymann and Nickerson & Co. were in the handwriting of Madelon and signed by deceased. The evidence of the circumstances under which these letters were dictated, if they were, and signed by Miss Campbell, as they were, is unsatisfactory. On May 29, 1926, a clerk representing Nickerson & Co., accompanied by a notary public, called upon Miss Campbell, and in their presence she signed, and they say acknowledged, the various stock powers. On May thirtieth or thirty-first Heymann paid his first visit to Miss Campbell at No. 1900 Grand Concourse and discussed with her certain claims which she then asserted against Sadie. On June first a letter written and signed by Madelon for her aunt was sent to Heymann, asking for what has been described as a will of the deceased. This will was later sought to be proved through a copy, and at first the alleged copy was received as an exhibit on behalf of plaintiffs, but afterwards stricken from the record as an exhibit on motion of plaintiffs and it has not been considered by the court. On June fourth a letter was written, signed and sent by Madelon to Heymann, giving a list of cash gifts. On June tenth Heymann paid his second visit to Miss Campbell, in the course of which it was agreed, if it had not previously been decided, that he should no longer represent her as attorney. On the occasion of these two visits conversations took place of which substantially different versions are given by him and Frances. It appears alike from the testimony of each that Miss Campbell believed Sadie still owed her $25,000 upon some transaction which does not clearly appear, and also $500 or $600 worth of American Snuff stock. Ultimately, I find, the claim for the larger amount was reduced to some $5,000, plus the Snuff stock. Heymann says that 2,384 shares of Imperial Tobacco Co., Lim., stock, which were concededly included neither in the gift nor the deed of trust, were not referred to at all either by Miss Campbell or Frances. Frances in her affidavit in opposition to the injunction did not deny that the deceased and the defendants were ignorant of the existence of this stock, but after the opinion of the Appellate Division had been rendered in the gift case (*Bronx County Trust Co.* v. *O'Connor,* 220

App. Div. 340) asserts that " British stock " had been mentioned. I attach more weight to her first silence on the subject, which is consistent with the testimony of Heymann, than to her testimony at the trial, both because she had a motive for the change due to the importance ascribed by the Appellate Division to the subject, and also because, since it is conceded that the value of these shares on the market at the time was $60,000 or more, and the market value must have been then known to both Frances and Madelon, there could have been no confusion between such an item and a transaction involving at most $25,000. Moreover, no reference to this block of shares appears either in the original form of the deed of trust or in the additions suggested by Frances which will be subsequently described. On June fourteenth Nickerson & Co. wrote Miss Campbell with reference to cabling about the stock powers, and Frances wrote to Heymann asking for the bank books. On June fifteenth or sixteenth Miss Campbell, assisted by Madelon and Frances (who lit the match), destroyed what has already been referred to as the will, and about the same time a letter was written by Frances and signed by deceased and delivered by Madelon to the New York Trust Company regarding the trust, and Nickerson & Co. wrote Miss Campbell that they had and would distribute $138,409.75 to Madelon and Frances; at this time also a cablegram was sent in the name of Miss Campbell to the British-American Tobacco Co. regarding the payment of dividends; also Heymann wrote a letter to Miss Campbell. On June seventeenth the lawyer Andrews, already mentioned, representing the defendant New York Trust Company, visited Miss Campbell, taking with him a draft of a new will. He asked her whether she wanted a will and she said, " No." He then asked her whether she desired a deed of trust and she said, " Yes." On June eighteenth Andrews prepared the trust deed, and Nickerson & Co. wrote Miss Campbell regarding the $138,409.75. On this same day Madelon and Frances received their checks, the former for $69,204.88, the latter for $69,204.87. In her examination before trial Madelon testified that she had shown deceased her own check, thus received, and described in detail her conversation with her aunt about the matter, but on the trial she admitted under cross-examination that the testimony was untrue and that she had never shown (after it was demonstrated to her that she could not have shown) her own check to Miss Campbell. This incident appears significant. One of the most important issues is whether Frances and Madelon abused the relationship of confidence in which they stood, through not keeping their aunt fully informed of business details or whether they fully and

fairly disclosed to her everything which bore upon her business dealings, especially those for their benefit. In this connection it should be remembered that Miss Campbell was not a person of education or business training, and could not have had any considerable experience in dealing with stocks because the securities in question were substantially the same certificates originally received from her brother, whereas Madelon, on account of her occupation, must have been familiar with such matters, and the firm of brokers who had put through the sale were her own employers. Madelon appears in the light of a witness willing to invent the detailed account of a conversation with her aunt which could never have taken place, and her explanation that she meant a different check is unconvincing. As for Frances, there is no testimony (except her own, which was stricken out) that the check received by her was ever shown to deceased. It was the proceeds, in the form of the checks, not the securities themselves, which were given, if anything was given. On June nineteenth Frances deposited her share, $69,204.87, in bank, and on the same day came another visit by Andrews, accompanied by one Thompson, also a representative of the defendant trust company, during which Miss Campbell signed the trust agreement. There were several interesting features of this visit, as to which we have only the testimony of witnesses called by the defendants. The physician employed by the defendants was present and made a preliminary examination of the patient. He gives it as his opinion that she knew what she was doing and was able understandingly to execute the instrument, but his detailed account of the examination upon which he based this conclusion is devoid of the details necessary to satisfy me of the correctness of the opinion rendered. The description of the conversations between those present and Miss Campbell includes a reading of certain parts of the deed of trust to her by the doctor. She did not read any part of the document herself. Before she signed it certain additions were made, suggested, not as already said by Miss Campbell, but by Frances. Since neither the body of the instrument nor the additions included the 2,384 shares of Imperial Tobacco Co. stock — as to that stock Miss Campbell died intestate — I am doubtful whether on account of her physical weakness and deafness she heard even what was read to her and still more doubtful whether she had any adequate comprehension of what she was doing. I am satisfied that she did not know the value and extent of her remaining property. She certainly could not have known, because there is no satisfactory evidence that she was ever told the value of what the deed of trust was to cover. Her acknowledgment of her act and deed, assuming

Misc. 294]                    Supreme Court, June, 1928.

she was correctly understood to make such an acknowledgment, thus lacks meaning or legal force. This was the culminating event in the series attacked by the plaintiffs, and nothing more of considerable importance occurred until June twenty-first, when she suffered paralysis of the legs, and the twenty-fourth, when she died. In the first part of this opinion I have summarized the uncontradicted testimony as to the physical condition of Miss Campbell during these eventful weeks and have followed it by a chronological statement of facts which, except for Heymann, who was called both on behalf of plaintiffs and defendants, and the documents in evidence, depends almost entirely upon the testimony of the defendants' witnesses. It appears that when the deceased performed certain of the important acts in favor of defendants upon which the latter rely to keep the money they received, such as the preparation for and execution of the stock powers, the preliminary interview relating to the deed of trust and the execution of the deed, as well as the destruction of the so-called will, she was lying helpless in bed or seated in bed and supported on either side by the defendants; that Frances H. O'Connor was present, sometimes acted as intermediary or interpreter, and on the last occasion without consulting her aunt dictated the subject-matter of additions to the trust deed; that Miss Campbell gave evidence of being so hard of hearing that those who addressed her were obliged to raise their voices and could not be certain that they were understood; that she at no time read any of the documents herself or wrote any part of them except her signature. There is no reason to suppose that on the other occasions of which we have no information except (as to some) from the lips of one or another of the three individual defendants, the conditions and circumstances were substantially different. Let us now examine the motives which must have affected the three women who dealt with the deceased, chiefly out of the sight and hearing of others, during this period of forty-five days. Each of them, previously poor, had enjoyed a taste of Miss Campbell's bounty. Mrs. O'Connor, mother of Frances and Madelon, must have been ambitious for them and had a practical personal interest in their success. Frances and Madelon realized that their sister Marguerite and their cousin Sadie had " got theirs," whether or not it is true that they ever confessed to such a thought or motive. Deliberately, or otherwise, they had already assisted in creating a situation as a result of which a dying, deaf, weak old woman lay almost completely in their power. In such a situation, given a reasonable amount of intelligence on their part — and none of them is unintelligent — it is unlikely we would find direct and perfect

evidence that they had either coaxed and persuaded their rich relative to leave Sadie and come to them, or that they sought and employed occasions and means to get her money more easily. But we have the facts already stated. In addition we know, dehors the alleged will, that they had been informed Miss Campbell was leaving Sadie by will substantially all her remaining money in addition to what she had already received, and that they believed the document which they helped destroy, whether correctly or not, to be such a will. They, therefore, possessed a strong motive to employ such influence as they could, directed to Miss Campbell, to obtain preference. They succeeded, so far as they could with their limited knowledge of what she owned, in obtaining her property for themselves by means of the gifts and the deed of trust, and depriving her other relatives of it. Heretofore, and in April, 1927, plaintiffs obtained an injunction in the gift action (*Bronx County Trust Co.* v. *O'Connor, supra*) restraining the defendants from disposing of the proceeds of the sale of the stocks. The opinion of the Appellate Division in granting this injunction is so fully reasoned, and the facts deduced from the affidavits are therein set forth in such detail, that it can scarcely be doubted what the conclusion of this court should be if the facts found by me after trial correspond to those assumed by the Appellate Division as the basis of their decision. Plaintiffs contend that the facts there assumed and here proven entirely correspond; defendants assert the contrary. It is unnecessary to agree with either. The question before this court is simply whether, given the facts found as the result of this trial and already here stated, the plaintiffs should have judgment. The Appellate Division in granting the injunction quotes *Cowee* v. *Cornell* (75 N. Y. 91, 99) as follows: " It may be stated as universally true that fraud vitiates all contracts, but as a general thing it is not presumed but must be proved by the party seeking to relieve himself from an obligation on that ground. Whenever, however, the relations between the contracting parties appear to be of such a character as to render it certain that they do not deal on terms of equality but that either on the one side from superior knowledge of the matter derived from a fiduciary relation, or from overmastering influence, or on the other from weakness, dependence, or trust justifiably reposed, unfair advantage in a transaction is rendered probable, there the burden is shifted, the transaction is presumed void, and it is incumbent upon the stronger party to show affirmatively that no deception was practiced, no undue influence was used, and that all was fair, open, voluntary and well understood. This doctrine is well settled. (HUNT, J., *Nesbit* v. *Lockman*, 34 N. Y. 167; * * * *Huguenin* v. *Baseley*, 13 Ves.

105; S. C., 14 id. 273; S. C., 15 id. 180; *Wright* v. *Proud*, 13 id. 138; *Harris* v. *Tremenheere*, 15 id. 40; *Edwards* v. *Meyrick*, 2 Hare, 60; *Hunter* v. *Atkins*, 3 My. & K. 113.)    And this is I think the extent to which the well considered cases go, and is the scope of ' constructive fraud.' "    In *Watson* v. *Holmes* (80 Misc. 48) the court set aside transfers made by the deceased to the defendant, who was his nurse. The deceased was a bachelor with business experience, though he had retired several years before.    The gifts consisted chiefly of transfers of stock, as in this case.    Although a very sick man at the time, with the defendant in attendance upon him, he was, in contrast to Miss Campbell, able to be up and around the house.    Nevertheless the court used the following language: " Mr. Rundel being ill and under defendant's constant care it is plain that they did not deal on terms of equality, and under these circumstances, whether the stronger party has seemingly obtained an unfair advantage over the weaker one, and has obtained a very large amount of property from the sick person in her charge, transactions effected under such circumstances may be presumed void, as was held in *Green* v. *Roworth* (113 N. Y. 462)    *    *    *.    Indeed, the facts as disclosed here made a *prima facie* case in favor of the contentions of the plaintiff, which should shift the burden to the defendant of proving that the transfers in question were the free and voluntary acts of Mr. Rundel by evidence that was clear and satisfactory (*Matter of Van Ness*, 78 Misc. Rep. 592; *Matter of Snelling*, 136 N. Y. 515; *Doheny* v. *Lacy*, 42 App. Div. 218; affd., 168 N. Y. 213)."    (See, also, *First Nat. Bank of Coffeyville* v. *Wright*, 207 App. Div. 521; affd., 240 N. Y. 559; *Kelly* v. *Kelly*, 116 Misc. 195; *Matter of Weber*, 118 id. 653, and *Bronx County Trust Co.* v. *O'Connor, supra*.)    Frances H. O'Connor-Flanagan-Lamberti, defendant and chief beneficiary, was the leader of the three women defendants.    It was she who acted as head, if not sole, nurse under the new physician that she herself had employed.    She was cognizant of the dismissal of her aunt's personal attorney, and, therefore, knew that during this critical and important period, while Miss Campbell was disposing (as Frances thought) of all her property, her aunt had no legal adviser.    If in her eagerness to secure benefits for herself and her sister she was willing to go so far, even though there was no deliberate intention to defraud, she cannot complain because deprived by statute of the privilege of describing everything that happened behind those closed doors and placing the most favorable construction upon her own acts and defaults.    It is precisely such a situation which section 347 of the Civil Practice Act seeks to meet for the protection of those who were not present and can

never know the whole truth. The admissions made in her testimony, while not sufficient to establish the most serious charges against her, add to the suspicions inherent in the circumstances. She has fallen far short of proving that the gifts and transfers in her favor were the free and voluntary acts of Miss Campbell. Madelon R. O'Connor was only in a less degree the beneficiary. Admittedly she took an active part in the transactions involved or some of them, and supplied her sister with the business experience, information and training necessary. As already noted, she is not a party to the trust action, and was thus fully competent to testify in respect to communications with the deceased which concerned the trust deed. She was not questioned regarding the circumstances leading up to the execution of this instrument, although her sister Frances testified on the examination before trial to many conversations with Miss Campbell about the latter's letter to the New York Trust Company, at some of which Madelon was present, and although Madelon had received this same letter from Frances and delivered it to the trust company. Mrs. Frances V. O'Connor, similarly relieved of the prohibition of section 347 of the Civil Practice Act, because not directly benefited in law by any of the transactions in issue, was called as a witness for the defendants on the last day of the trial, the case having been reopened on consent for the purpose of permitting her to testify. When examined in the Surrogate's Court on November 15, 1926, she said she did now know what or how much her daughters had received, and did not hear any conversations between the deceased and her daughters relating to that subject. In her testimony at the trial her memory was at first otherwise, but when confronted with the surrogate's record she became evasive, uncertain and almost incoherent. The court is left in doubt whether any such conversations as she then described ever took place. She could scarcely have resided with her sister during these forty-five days without seeing and hearing much which, if truthfully described, would be helpful to the court and perhaps conclusive of the issues before it. On the contrary, the net result of her testimony, like that of her daughters, is to heighten the suspicion which attaches to the disposition of the property of the deceased under the admitted circumstances. The defendant New York Trust Company, though something more than a stakeholder, as it claims, did not take a leading part in the defense. Allowing for natural bias, its employee called as a witness attempted to be fair and truthful, but his testimony, which I think has been sufficiently commented upon, does not relieve the individual defendants of the suspicion to which their conduct has exposed them and the instrument by which it

is created trustee appears in no stronger a position than the earlier so-called gifts. If, as stated by the authorities to which I have referred, it is the law that where inequality exists and suspicion of unfair treatment of the weaker party by the stronger is present, the burden is on the latter to clear up the suspicion and show affirmatively that no deception was practiced, no undue influence used, and that all was fair, open, voluntary and well understood, I must find that this burden has not been sustained by the defendants. The plaintiffs will have judgment in each action.